# MILDRED MARGARET JENSEN AND ANOTHER
## v. JOHN H. LINNER AND ANOTHER.

108 N. W. (2d) 705.

April 7, 1961—Nos. 37,927, 37,928.

*Richards, Janes, Montgomery & Cobb, Crane Winton,* and *Roderick D. Blanchard,* for appellant.

*Dygert & Gunn,* for respondents Jensen.

*Meagher, Geer, Markham & Anderson* and *O. C. Adamson II,* for respondent The Swedish Hospital.

NELSON, JUSTICE.

This appeal involves actions by Mildred Margaret Jensen and her husband, Ralph L. Jensen, to recover for her personal injuries and his

consequential damages sustained by reason of the alleged negligence of Dr. John H. Linner, the appellant, and The Swedish Hospital in connection with an operation performed by Dr. Linner upon Mrs. Jensen at said hospital on January 27, 1956. Plaintiffs claim that during the course of the operation Mrs. Jensen incurred a lesion on the anterior or front portion of her left leg just above the ankle as a result of defendants' negligence in permitting phenol, a caustic chemical used in the operation, to come in contact with her leg. The cases were tried together before a jury. The Swedish Hospital moved for a directed verdict at the close of plaintiffs' evidence, which the trial court granted. It denied a motion by Dr. Linner for a directed verdict at that point and again at the close of all the evidence.

Requested instructions were presented to the trial court in behalf of Dr. Linner. Some were granted, some given in substance, and others denied. Certain instructions requested by plaintiffs concerning res ipsa loquitur were given although exceptions were taken to their inclusion.

The jury during its deliberations returned for additional instructions on the issue of vicarious responsibility. Exceptions to the trial court's additional instructions were taken by Dr. Linner's counsel as misstatements both of fact and of law.

The jury returned a verdict for Mrs. Jensen for $7,000 and for her husband for $4,000. No issue has been raised as to the amount of the verdicts.

The trial court denied Dr. Linner's motion for judgment notwithstanding the verdict or, in the alternative, for a new trial, and he appealed from the trial court's order, and after judgment was entered for the hospital in each case he also appealed from the judgments.

A motion for judgment notwithstanding the verdict accepts the view of the evidence most favorable to the verdict and admits every inference reasonably to be drawn therefrom, as well as the credibility of the testimony for the adverse party, and if application of this rule, in the light of the evidence as a whole, discloses a reasonable basis for the verdict, the motion must be denied.[1]

---

[1]See, Sundeen v. Barthel, 241 Minn. 398, 63 N. W. (2d) 267; Cofran v. Swanman, 225 Minn. 40, 29 N. W. (2d) 448; Sanders v. Gilbertson, 224

The facts which may be considered pertinent here are as follows: Mrs. Jensen had been a patient of Dr. Linner for about 2 years prior to the operation involved here. She was admitted to The Swedish Hospital at Minneapolis, January 26, 1956, as his patient for the performance of a hysterectomy. She was prepared for surgery that evening and on the following morning was taken to the operating room. Routine precautions were taken, such as covering her lower body with layers of cotton and plastic drapes. Present in the operating room, besides Dr. Linner, were an associate, a hospital intern, a circulating or sponge nurse, an instrument or scrub nurse, two anesthesiologists, and a student nurse. After completing the hysterectomy Dr. Linner found that the appendix did not appear to be normal and decided to perform an appendectomy. This was made known to the operating staff. The appropriate instruments for performing the appendectomy were at hand and the only additional item needed was phenol for use by the doctor to cauterize the stump of the appendix. Phenol is a caustic chemical and, in the strength used for such cauterizing purposes, burns human flesh very easily. When the time came to cauterize, the circulating nurse had to go to the supply cabinet in the operating room in order to secure the bottle of phenol. While the circulating nurse could not recall the handling of the phenol during this particular operation she did testify to the usual procedure. A small amount of phenol solution is poured into a monel, one-ounce cup held for her by the student nurse. Another nurse dips a cotton-tipped applicator into the cup and hands it to the instrument nurse, who hands it to the doctor. After application of the phenol in this operation, the doctor was closing the incision when he was informed that two sponges were missing. He ordered an X-ray taken from which it was ascertained that no sponge had been left in the patient. She was then lifted from the operating table for transfer to the recovery room. At that time Myrtle Myers, the instrument nurse, noticed a grey indented area on plaintiff's leg just above the ankle and pointed it out to the circulating nurse. An intern subsequently examined the area and described that mark as 2 inches in

Minn. 546, 29 N. W. (2d) 357; Norling v. Stempf, 208 Minn. 143, 293 N. W. 250.

diameter with blisters all around the area. He stated that it looked like a burned area but that it was not inflamed at the time.

Miss Myers testified that she met Dr. Linner in the hall after the operation; that she talked to him about the missing sponge but did not talk to the doctor about the mark on Mrs. Jensen's leg at that time. She did state that one of the supervising nurses contacted her by telephone to inquire what she knew about this indented area. The circulating nurse, in a deposition, stated that she recalled Dr. Linner's mentioning phenol after the operation; that she believed it came into the conversation with Dr. Linner; that she remembered that she did talk to him about it and that he asked a few questions with regard to the way she had poured the phenol and so forth.

Dr. Linner testified that he made the rounds at the hospital the day after the operation between 7 and 10 a. m.; that at that time the condition on Mrs. Jensen's ankle had the appearance of a burn and he so recorded it in the hospital records, but did not consider neutralizing the area at that time. He also stated:

"I don't believe at that time, I don't recall at what time I considered phenol as a possible cause. That certainly was entertained as I went back over the whole procedure, because I checked with the operating room to find out what the cause could be, but when I first saw this burn I didn't consider phenol or any other thing. I just was trying to figure out what it was. At what point after I don't know, whether it was that day, next day, or third day that I thought it might be phenol."

The doctor said he had never seen a third-degree phenol burn but agreed that it is probable that if phenol is left on long enough it would cause a third-degree burn. He said that phenol continues to burn until it is absorbed either in the body or in the air or by some other means of absorption or removal. He was asked if covering the burned area with vaseline and a Burrow's pack would interfere with evaporation or absorption of the phenol into the air. He stated that he was not sure but that there would be little likelihood of evaporation by the time these treatments were given.

There were admissions by Dr. Linner that nothing was used in the operation except phenol that could cause a chemical burn, and that

no instrument was used to which he could attribute it with factual basis. What appears to be established in the record as a third-degree burn is referred to time and again as a lesion by Dr. Linner, even though he admitted that it was a burn. He differentiated between the two words as follows:

"A.   The only difference is this, that unless you know what the cause of something is, it is better to use the word, lesion, *because if you say burn, then you imply it has been in fact burned,* and you don't always know that, so lesion is the better term. It's a better term until you know, until you establish a diagnosis.

"Q.   A burn is more—

"A.   A burn is also general in that it could be thermo, chemical. It's more specific than lesion. Lesion is a very general term." (Italics supplied.)

It is significant that Dr. Linner wrote in the hospital record the day after the injury that the area had the "appearance of a burn"; that Dr. Antiqua, the day before, described it in the hospital record as appearing to be a "burned like area"; and that on February 3 Mrs. Jensen was seen by Dr. O. J. Campbell who felt the area was "consistent with 3rd degree burn of some sort * * *."

Dr. Linner was asked point blank:

"Q.   Was this a third degree burn?

"A.   *Well, in fact, as it turned out, it was;* but at the time we were faced with this lesion, I couldn't be sure, no one really could be sure whether it was second or third degree or whether it was a burn."

"Q.   *So that there won't be doubt left in anybody's mind, Doctor, do you agree after all our testimony here that what you saw when you saw Mrs. Jensen after the operation for the first time, that you saw a third degree burn of some kind?*

"A.   At that time when I first saw her, and I think you would find it borne out in the record, I wasn't sure, * * *. *As time went on it became more and more apparent that it was in fact a third degree burn* and that it would have to be excised and grafted." (Italics supplied.)

Phenol is carbolic acid and was described by Dr. Linner as "a corrosive cauterizing agent" and "a very strong caustic chemical substance."

Jose B. Calva, a graduate chemical engineer, registered in Minnesota as a chemical, mechanical, and electrical engineer, testified that pure phenol is solid but as used here it was mixed with 11-percent water forming a solution which on coming into contact with a tissue actually destroys it, first by dehydration, and then by entering into chemical reactions with it. His testimony indicates that he has had considerable experience with the use of phenol in the mouton process for curing wool and in other chemical research. He also indicated experience with phenol burns. Dr. Linner was largely in agreement with Mr. Calva. For example, Dr. Linner was asked:

"Q.   You agree, however, that that is entirely probable if left on long enough?

"A.   That it could cause third degree burn? I think it's *probable,* yes." (Italics supplied.)

Mr. Calva testified that if phenol is allowed to remain on the skin it continues to act until it reaches a dilution at the expense of the moisture of the tissue where it is not harmful any more but in that process it undergoes a series of actions on the skin causing color changes from grey to black, leaving a red ring around the burn which indicates the limit to which diluted phenol has diffused uniformly. The skin does not present any specific resistance in any particular direction. Phenol, therefore, when it is applied on the surface of the skin in liquid form does exactly the same thing as a drop of ink does on a blotter—it extends in the form of a circle.

Dr. Linner, pretty much in agreement, testified:

"Q.   Doctor, the property phenol continues to burn until it's absorbed either in the body or through the air by some other means of absorption or removal, is that correct?

"A.   I think that's correct."

"Q.   As a result of this diffusing of that drop, would it end up in a *circular* area on the flesh?

"A.   Yes.

"Q. Now, is that a characteristic of a chemical burn where a drop or minute portion has been dropped on the flesh?

"A. *It is a characteristic of a chemical burn that would be the result of a drop on the flesh that it would be circular, yes.*" (Italics supplied.)

The record shows that witness after witness described the burn and without exception they described conditions which Mr. Calva and Dr. Linner said were characteristic of phenol burns. Miss Myers was the first to see it when lifting Mrs. Jensen off the operating table. It was then a "grey indented area," bigger than a fifty-cent piece. Ralph Jensen saw it next when his wife came out of the anesthetic. He immediately summoned a nurse and she in turn summoned an intern. Mr. Jensen also called Dr. Linner at approximately 4:15 that afternoon. Plaintiff testified that she looked at her ankle which she said was "burning terribly" and described it as "greyish-white and concave." Mr. Jensen saw the ankle the next morning, describing it as of grey color, concave, and said he would compare it with the palm of a hand, depressed in the center. The coloring continued to get darker. The circulating nurse went up to look at the burn a few days after the operation. She said, "It was circular—circumscribed with a very red ring." She also said that the lesion was of "greyish appearance." Dr. Conrad Karleen, who was called in to excise the area on February 28, 1956, described it as an ulcer measuring 2½ inches in diameter covered with dark necrotic tissue. Dr. Samuel G. Balkin, a plastic surgeon, examined the burned area on February 7, 1956. His notes indicated that he observed an area of dead skin on the front surface of the left ankle that measured approximately 2½ inches in diameter and that there was a red ring about the margin of this circle. Dr. Linner himself, examining the condition the day after the operation, described it as follows:

"She had a *circular* lesion on her left ankle just above the ankle on the front of the ankle that was about 2½ to, well, might say 2½ inches in diameter, *and it was somewhat depressed in the center. It was dark and it had a red ring about it,* and there were a few little blisters around the edge." (Italics supplied.)

Dr. Linner at no time expressed an opinion that Mrs. Jensen's injury was not a phenol burn. His position continued to be that it had not been established to his satisfaction that phenol caused the burn but there are statements made by him throughout his testimony which would indicate that phenol was the only cause he seriously considered.

Mr. Jensen testified to a conversation with Dr. Linner on Sunday morning after the operation as follows:

"Q. Did you ask him if he had made any investigation concerning it?

"A. Yes. He said he had had a meeting with the nurses.

"Q. Did he tell you what—in his conversation did he mention what he thought was the cause of the condition?

"A. He told me that when the operation was in progress they discovered that the appendix were to be removed, and phenol is used in this operation.

"Q. What else did he say, if anything, about phenol?

"A. Well, he said that was the only chemical that he knew that was used in the operation of the appendix."

Mrs. Jensen testified to two conversations with Dr. Linner as follows:

"Q. Well, at any time during these first two conversations had the word 'phenol' come up in the conversation?

"A. Yes, I think it was around four or five days later when he came in after he had checked with the nurses, and then he came in and explained to me he didn't know what had happened, and *he felt that phenol had been used, and told me about the appendix and that would be the only thing he could think possibly happened, phenol could have been spilled."* (Italics supplied.)

Dr. Linner admitted that he had checked with the nurses to see if they had spilled phenol and testified at another point:

"Q. Now, when you talked to Miss Odell about this burn, *did you, in your conversation with her, consider phenol to be a cause?*

"A. Yes." (Italics supplied.)

The record indicates no doubt that it was a third-degree burn, and

the evidence that the burn had all the characteristics of a phenol burn is impressive.

Several witnesses testified regarding the amount of phenol usually used in an appendectomy, this testimony varying considerably. Some described the amount poured as only a drop or a few drops. Esther Cornelius, the clinical instructor, described it as less than a dram. A dram was estimated at 70 drops. Dr. Linner described the amount poured as a few cc's. Mr. Calva testified that as a rule of thumb there are 20 drops in one cc of liquid. A glass bottle with a screw lid contained the phenol which the circulating nurse poured from it into the monel cup. Dr. Linner admitted that one drop of acid soaking through the skin would cause a circular burn.

■■ Plaintiffs' verdicts can stand only if the evidence is legally sufficient to support findings that phenol was the cause of the lesion, that there was negligence in handling of phenol, and that such negligence was the proximate cause of the lesion. Appellant contends that plaintiffs have failed to eliminate the other possible causes from the case. As we view the record we do not think it necessary that plaintiffs be required to exclude every other reasonable hypothesis by the circumstantial evidence introduced. See, Smock v. Mankato Elks Club, 203 Minn. 265, 280 N. W. 851; see, also, Hagsten v. Simberg, 232 Minn. 160, 44 N. W. (2d) 611, where the same rule is emphasized.

Quoting from Sherman v. Minnesota Mutual Life Ins. Co. 191 Minn. 607, 612, 255 N. W. 113, 115, in the Hagsten case this court reaffirmed the following rules (232 Minn. 164, 44 N. W. [2d] 613):

"* * * Reasonable minds functioning judicially must be able to conclude from the circumstances that the theory adopted by the verdict outweighs and preponderates over any other theory; but, as said in 1 Jones, Evidence (2 ed.) § 12:

" 'In a civil case, circumstantial evidence need not exclude every reasonable conclusion other than that arrived at by the jury.'

"And again in note 20 to that section the learned author says:

" 'In a civil case, to warrant recovery on circumstantial evidence, the evidence must "outweigh" other hypotheses than the one contended for in the sense that evidence sustaining the hypothesis contended for

must preponderate as against the others, but it need not "exclude" them in the sense of conclusive demonstration of impossibility.'

"In other words, in a civil case an issue need not be proved beyond a reasonable doubt or demonstrate the impossibility of every other reasonable hypothesis. (Citing cases.) *The rule quoted from Jones seems a reasonable one, and we adopt it.*" (Italics supplied.)

■ Appellant contends that the necessary findings of negligence and proximate cause could not be drawn from the circumstantial evidence in this case; that such findings would be "unsupported by applicable law." We think appellant is in error in this respect. It is not necessary that there be eyewitnesses of defendant's conduct to prove negligence since like any other fact it may be proved by circumstantial evidence; i. e., evidence of a fact, or a set of facts, from which the existence of another fact may reasonably be inferred. Prosser, Torts (2 ed.) § 42. As that authority further points out (§ 42, p. 200):

"* * * It [circumstantial evidence] involves, in addition to the assertion of witnesses as to what they have observed, a process of reasoning, or inference, by which a conclusion is drawn. * * *

"* * * there is still no man who would not accept dog tracks in the mud against the sworn testimony of a hundred eye-witnesses that no dog has passed by."

Witnesses on both sides are agreed as to certain characteristics which are usually found in a phenol burn that has not been neutralized. No attempt was made to establish similarity between this third-degree burn and an ulcer produced by vascular obstruction or between this burn and the type of burns likely to result from an electro-cautery machine or from other suggested causes.

In seeking the cause of the injury Dr. Linner considered the electro-cautery machine. He testified, however, that it "didn't seem obvious to me" and that he had "no facts, reasons" for relating use of the electro-cautery to the lesion. Dr. Karleen effectively ruled that out as a possibility. He said that it "could be a chemical burn," but could not have been caused by the machine. When Dr. Karleen was questioned about the possibility of this burn being caused by vascular obstruction or pressure he said:

"A. In my opinion that lesion couldn't be caused from it."

Dr. Karleen took the view that there was nothing in the fact situation that would lead him to believe there had been any blow or harm done by any outside force to the skin. Dr. Linner was asked:

"Q. Doctor, insofar as chemical burns are concerned, there was nothing that was used in this operation except phenol that would cause a chemical burn, isn't that true?

"A. That's true."

Dr. Linner was finally asked:

"Q. * * * was there any other instrument or any other chemical in that operating room that you can account from your examination and study of the thing, you could with factual basis attribute to the cause of this burn on her ankle?

"A. No."

Viewing the testimony as a whole, all possibilities of a burn from any source except phenol appear to have been eliminated. The jury could find that phenol was the instrumentality causing the injury. Plaintiffs were not bound to disprove every suggested cause. It has been held, and we think it well-established law and applicable here, that if the circumstances supporting a theory of negligence are of greater weight than the evidence supporting the theory of no negligence, then it becomes a question of fact for the jury to determine whether or not the cause of the injury was the negligence alleged and that a person is not required to prove his theory of negligence by testimony so clear as to exclude every other possible theory. Boles v. Hotel Maytag Co. 218 Iowa 306, 310, 253 N. W. 515, 517; Whetstine v. Moravec, 228 Iowa 352, 291 N. W. 425.

This case has been tried upon the theory of negligence. Appellant contends that the jury's finding of negligence lacks foundation in the evidence and that either a verdict should have been directed for Dr. Linner at the close of the trial or he should later have been granted judgment notwithstanding the verdict. It must thus be determined upon this appeal (1) whether there is competent evidence from which a jury could reasonably find that a negligent act of some kind occurred;

and (2) whether there is competent evidence that such negligence proximately caused the injury. If there is sufficient evidence to support the jury's finding of negligence, then a finding concerning proximate cause is equally supported. In other words, if phenol has been established as the cause of the burn, findings of negligence, proximate cause, and vicarious liability are supported.

Plaintiffs contend that phenol has been established as the cause of the condition. The proper procedure for handling phenol in the operating room was outlined by the supervisor of nurses. Nurses are instructed in the use of it, taught to put alcohol on immediately if phenol comes in contact with the flesh. She stated that she didn't know of any other way of neutralizing phenol in the operating room and that the nurses are instructed to be very careful it isn't spilled in any way because phenol does cause burns. Other testimony shows that Dr. Linner stood on the right side of the patient and Miss Myers, the scrub nurse, was at his right and as she put it, "close to the foot on the right side [of the operating table]." The student nurse was at her post across the table from the scrub nurse. She apparently stood in the area of plaintiff's left leg and ankle when she held out the monel cup into which the phenol was poured from its container, a glass jar with a screw top.

■ Appellant contends that the opinion of qualified experts was necessary in order for the jury to find that phenol caused the injury or for the jury to conclude that the phenol was handled negligently, that such expert opinions were lacking, and the verdict was based only on speculation.

Expert opinion is not required with respect to all medical and surgical errors. The rule was well stated and illustrated in Prosser, Torts (2 ed.) § 42, p. 210:

"There are, however, some medical and surgical errors on which any layman is competent to pass judgment and conclude from common experience that such things do not happen if there has been proper skill and care. When an operation leaves a sponge in the patient's interior, or removes or injures an inappropriate part of his anatomy, or when a tooth is dropped down his windpipe, or he suffers a serious

burn from a hot water bottle, or when instruments are not sterilized, *the thing speaks for itself without the aid of any expert's advice."* (Italics supplied.)

In Becker v. Eisenstodt, 60 N. J. Super. 240, 158 A. (2d) 706, the question before the court was whether laymen were competent to pass judgment on the medical error allegedly committed by the defendant, a surgeon who had performed an operation on plaintiff's nose. Plaintiff claimed that during post-operative treatment defendant placed in her nostril a pledget which he had negligently saturated with a caustic solution instead of the solution normally used, causing a serious burn. Defendant testified that he had used the proper solution. Another doctor testified unequivocally that he had never seen a condition like plaintiff's caused by an infection and another doctor, although admitting on cross-examination that an infection could be the cause, was clearly of the opinion that plaintiff had been burned by a caustic substance. The court held that the case was one within the field of legitimate inference, where a lay jury might properly conclude, from the established facts and in the absence of a satisfactory explanation by defendant, that he was negligent in moistening the pledget with a caustic solution rather than the proper one, saying (60 N. J. Super. 246, 158 A. [2d] 710):

"* * * This is a medical error on which a layman is competent to pass judgment and conclude from common experience that such things do not happen if proper skill and care have been used. Prosser on Torts (2 ed. 1955), § 43, p. 210 * * *. *Situations like these speak for themselves without the need of any expert testimony as to any departure from standards of care.*

* * * * *

"We conclude, therefore, that plaintiff established a prima facie showing of negligence. All he was required to do was to establish circumstances so strong that a jury might properly, on grounds of probability rather than certainty, exclude the inference favorable to defendant." (Italics supplied.)

Appellant strenuously contends that the record does not present suf-

ficient evidence of proximate cause. Again this is based on the claim that the third-degree burn from which plaintiff was suffering was not shown to be a phenol burn. We think the answer to that contention is that once the basic finding of the jury is adopted from the evidence in this record that the injury was a phenol burn and that there was negligence in handling phenol in the operating room, that the balance of the findings by the jury including proximate cause are sufficiently compelled by the evidence as a whole on the record before us. To support his contention that expert medical testimony is required to show causal connection here appellant cites: Williamson v. Andrews, 198 Minn. 349, 270 N. W. 6; Nelson v. Nicollet Clinic, 201 Minn. 505, 276 N. W. 801; and Saaf v. Duluth Police Pension Relief Assn. 240 Minn. 60, 59 N. W. (2d) 883. The Williamson case involved the question of whether there was a failure to diagnose properly an inflammatory process in the bone.

In the Nelson case the question was whether there was malpractice because a cast had been placed on too tight. The question of proximate cause involved was whether the injuries resulted from the cast being too tight. No similar question is presented in the instant case. Where no question of causation is involved once the injury is found to be a phenol burn, all later operations found to be necessary because of the burn, and any permanent disability resulting therefrom all admittedly have the same source.

In the Saaf case a medical question was presented as to whether a blow on the head had resulted in a tumor, a case nevertheless wherein this court said (240 Minn. 64, 59 N. W. [2d] 886):

"In passing upon the specific evidence regarding aggravation, it is to be noted that we are not here concerned with a case where death is so immediately, directly, or naturally and probably the proximate result of the injury that any layman of average intelligence, without the aid of a medical expert, would know from his own knowledge and experience that the injury was the cause of death."

Plaintiff is not required to prove causal connection by direct evidence. If circumstantial evidence furnishes a reasonable basis for the inference that negligence of the doctor herein was the cause of the

phenol burn, the case should be submitted to the jury. Clark v. George, 148 Minn. 52, 180 N. W. 1011.

■ This court has said that there may be cases where, the mode of the treatment having been shown, the practical common sense of the jury will enable them to determine that the injury or failure of cure is owing to unskillful or negligent treatment. Getchell v. Hill, 21 Minn. 464. This court has also said that there are cases where the layman may draw permissible inferences in relation to causal connection without the aid of medical expert testimony. Bush v. Cress, 181 Minn. 590, 233 N. W. 317; Harju v. Allen, 146 Minn. 23, 177 N. W. 1015; Fowler v. Scheldrup, 166 Minn. 164, 207 N. W. 177. In Moehlenbrock v. Parke, Davis & Co. 145 Minn. 100, 103, 176 N. W. 169, 170, this court said:

"Appellants insist that, since no expert witness testified that appellants did or omitted to do anything contrary to good surgery and practice, it was the duty of the court to direct a verdict in their favor. We do not concur in this contention. From the testimony of the defendant surgeons, and from common knowledge of physical facts and laws, the jury might infer that, if appellants had desisted from the use of the ether at the first sign of danger, decedent's life might have been spared, and that reasonable prudence required them to do so.

"It is only in cases where the evidence and the facts to be deduced therefrom, are undisputed, and the case concerns a matter of science or specialized art, or other matters of which a layman can have no knowledge, that the opinion of experts is conclusive."

The evidence seems clear that if the burn on plaintiff's left leg was a phenol burn, as the jury found it to be, it occurred during the time the appendectomy was performed.

Dr. Linner testified that each doctor who specializes in surgery has his own techniques and his own "suture card" which is a set of instructions the nurses are expected to follow in each type of operation which he is going to do. He testified as to his own method as follows:

"Q. And the same during an appendectomy you, on your suture card, say you want phenol, isn't that true?

"A.   That's right.

"Q.   And that was your practice up to the time this operation was carried on?

"A.   That's right.

"Q.   And you, as a doctor, in effect, have given this circulating [nurse] instructions to have phenol available for your use?

"A.   That's right.

"Q.   *Insofar as those instructions are carried out, then, Doctor, they are operating under your direction during the operation?*

"A.   Yes, that's correct." (Italics supplied.)

The appellant under his assignments of error questions the following from the trial court's instructions. First:

"* * * The law does not require every fact and circumstance which makes up a case of negligence to be proved by direct and positive evidence, and that circumstantial evidence may authorize a finding of negligence. Negligence may be inferred from all the facts and surrounding circumstances, and where the evidence of such facts and circumstances is such as to take the case out of the realm of conjecture and into the field of legitimate inference from established facts, a prima facie case is made."

We think cases already cited and discussed herein justify the above instruction of the trial court. See, Connolly v. The Nicollet Hotel, 254 Minn. 373, 95 N. W. (2d) 657.

Appellant excepted also to the following:

"But where a person receives injuries from some means or instrumentality in the control of the defendant which does not ordinarily occur where reasonable care is usually used by defendant, and the injury occurs under such circumstances that the defendant could have the means of determining how it occurred, and the cause thereof, and the plaintiff does not have this information, then the jury may infer that the injury was due to some negligence of the defendant. *The jury is not obliged to draw such inference, but you may do so;* and in the absence of evidence satisfactorily showing freedom from negligence, may find a verdict for plaintiff. Where such a situation exists, the jury has

a right to consider it *with all the other evidence in the case,* but the burden rests upon plaintiff to prove by a preponderance of the evidence that the defendant was negligent and that his negligence was the proximate cause of the accident, or the lesion in this case." (Italics supplied.)

Appellant contends that this instruction is based on the doctrine of res ipsa loquitur and is improper on the following grounds: (1) It is not applicable because the cause of the accident is unknown; (2) there is no evidence that the claimed cause of the burn was something within the control of appellant; and (3) there is no evidence to establish the cause of the burn and that the accident was one that ordinarily would not occur in the absence of negligence.

■ It is true that the cause of the injury was unknown to plaintiffs since Mrs. Jensen was under an anesthetic at the time. The record indicates a phenol burn to the practical exclusion of any other cause and the jury so found.

Appellant contends that this portion of the charge contains an incorrect statement of law because it permits the jury to infer from the occurrence of the injury that appellant was negligent and does not require the jury first to find and identify the cause of the alleged harm. We cannot accept this view. The court's charge must be considered as a whole. The trial court required that the jury must first find by a preponderance of the evidence that the injury plaintiff sustained was due to a phenol burn before proceeding to a consideration of the question of negligence. It is apparent that the jury proceeded to make findings in that order which the evidence amply sustained. Under the circumstances nothing remains of appellant's contention that the trial court improperly gave a so-called res ipsa loquitur instruction.

■ Appellant, however, does not, nor can he, argue that res ipsa loquitur is inapplicable in all malpractice cases. The cases appellant cites establish otherwise. This court in Johnson v. Arndt, 186 Minn. 253, 257, 243 N. W. 67, 69, pointed out that:

"* * * We have cases involving the negligence of physicians and surgeons where the rule has been applied to a limited extent. But *in*

*each of these cases there was direct evidence* as to the cause of the injury.

"In Moratzky v. Wirth, 67 Minn. 46, 69 N. W. 480, defendant, called to treat the plaintiff in childbirth, failed to remove all of the afterbirth. Part of it remained and putrified, causing blood poisoning. There was no other evidence of negligence, but the court held that from the facts and circumstances shown the jury could reasonably infer that defendant was negligent in failing to remove all of the placenta.

"In Jones v. Tri-State T. & T. Co. 118 Minn. 217, 136 N. W. 741, 40 L.R.A. (N.S.) 485, the plaintiff was seriously burned and injured in the taking of an X-ray picture, and the court held that, such injury not being one likely to result if proper care were used in operating the X-ray apparatus, the jury might infer negligence in its operation.

"In Vergeldt v. Hartzell (C.C.A.) 1 F. (2d) 633, cited by plaintiff, the defendant, a dentist, was polishing an inlay in one of plaintiff's teeth. He was using a power-driven, rapidly revolving drill or tool, to which the polishing disc was attached. He permitted the drill to slip from the inlay, penetrate the floor of plaintiff's mouth, and lacerate and injure her tongue and mouth. There was no other evidence of negligence, but the court held that from the injury and the manner in which it was inflicted and circumstances shown the jury could infer that defendant was negligent." (Italics supplied.)

The Johnson case quite clearly establishes the applicable law in the instant case. Where the cause of the injury is established, as it has been here, an inference of negligence may be permitted and the trial court may properly instruct the jury to that effect. Mrs. Jensen's only exposure to phenol was during the operation. It is undisputed that phenol is a caustic chemical substance requiring special precautions to avoid spilling on human flesh. This requirement of special care had been impressed on everyone functioning in the operating room. Under all the circumstances surrounding Mrs. Jensen's operation it is only common logic to permit an inference of negligence from the facts.

The trial court made no mention of the doctrine of res ipsa loquitur as such in its instructions. There is nothing in the conditions necessary for the application of that doctrine in conflict with conditions which

the record discloses in the instant case nor which would render the trial court's instructions as to proof of negligence improper or otherwise objectionable when the charge is considered in its entirety.[2] The exclusive control of the instrumentality which caused the accident was in appellant. His contention that the cause of the accident is unknown is not supported by the record. It is conceded that Mrs. Jensen did not contribute to it voluntarily or otherwise. See the following testimony of Dr. Linner:

"Q. Long before this operation ever started you knew that [the cauterizing and dangerous propensities of phenol], and when you put phenol on your suture card as an instruction for the nurses, you expected that that would be handled carefully for your use during the appendectomy?

"A. That's right."

"Q. Doctor, carrying on a procedure such as you have done and the way you did it to Mrs. Jensen, have you ever seen anyone with burns on their extremities when you are doing an appendectomy?

"A. No.

"Q. *So you would not expect that to happen in carrying out the type of procedure you are carrying out—*

"A. No.

"Q. *—is that correct?*

"A. That's correct.

"Q. *And she was unconscious throughout the whole period of time and no involuntary movement on her part?*

"A. *Not that I know of.*" (Italics supplied.)

In Frost v. Des Moines Still College, 248 Iowa 294, 79 N. W. (2d) 306, cited by appellant, the court approved a res ipsa loquitur instruction even though the evidence submitted did not identify the producing cause of the burn in question.

Prosser, Torts (2 ed.) § 42, pp. 201, 204, sets out the conditions usually stated as necessary for the application of the principle of res ipsa loquitur as follows:

---

[2]See, Rules of Civil Procedure, Rule 43.06.

(1) The accident must be of a kind which ordinarily does not occur in the absence of someone's negligence;

(2) It must be caused by an agency or instrumentality within the exclusive control of the defendant;

(3) It must not have been due to any voluntary action or contribution on the part of the plaintiff.

The following discussion of these conditions appearing there is applicable here:

"In many cases the inference to be drawn is a double one, that the accident was caused in a particular manner, and that the defendant's conduct with reference to that cause was negligent. But the inference of negligence may also arise where a definite cause is known, or where the accident is more or less a mystery, with no particular cause indicated. When a gasoline filling station mysteriously explodes, many possible explanations can be suggested, but the most likely one may be negligence on the part of those in charge. The plaintiff is not required to eliminate all other possible causes, or inferences; and all that is needed is evidence from which reasonable men can say that on the whole it is more likely that there was negligence associated with the cause than that there was not. It is enough that the court cannot say that the jury could not reasonably come to that conclusion.

*   *   *   *   *

"This element [(2) above] usually is stated as meaning that the defendant must be in 'exclusive control' of the instrumentality which has caused the accident. * * * *It is enough that the defendant has the right of control and the opportunity to exercise it,* as in the case of an owner who is present while another is driving his car, or a landowner who permits visitors to come on his premises. *It is enough that he is under a duty which he cannot delegate to another, as in the case of a surgeon who allows a nurse to count the sponges.*" (Italics supplied.)

Plaintiffs have cited several cases involving the application of the doctrine of res ipsa loquitur to malpractice cases. Each turns on the specific facts involved. We do not consider it necessary to discuss these

cases though we believe they are worthy of citation and support plaintiffs' position herein.[3]

■ There is little question about the right of control in the instant case. The Minnesota cases are clear as to the responsibility of the operating surgeon. If phenol was the cause of the burn, as the jury found, then the cause of the accident was such that Dr. Linner would be responsible and the trial court's instructions were appropriate. See, Swigerd v. City of Ortonville, 246 Minn. 339, 75 N. W. (2d) 217, 72 A.L.R. (2d) 398; St. Paul-Mercury Ind. Co. v. St. Joseph's Hospital, 212 Minn. 558, 4 N. W. (2d) 637.

Appellant cites the case of Wallstedt v. Swedish Hospital, 220 Minn. 274, 19 N. W. (2d) 426, in support of his contentions. That case involved a burn, the cause of which was unexplained, and under the evidence it could have been contributed to by several causes, some of which were not under defendant's control. The court upheld the verdict of the jury for the defendant. What was missing in the Wallstedt case was present in the instant case. This appeal presents an accident which ordinarily does not occur in the absence of negligence. It was found to be caused by an instrumentality under the exclusive control of appellant. The instructions were applicable and it would have been error for the trial court not to have given them.

The trial court after granting the motion of The Swedish Hospital for a directed verdict explained to the jury that he was doing so because at the time the accident occurred the hospital personnel in the operating room were the servants of the doctor and not of the hospital, and he would be responsible for their acts.

The trial court's instructions to the jury made it clear that plaintiffs claim that phenol was negligently permitted to come into contact with Mrs. Jensen's leg sometime during the operative procedure by some-

---

[3]Vergeldt v. Hartzell (8 Cir.) 1 F. (2d) 633; Vonault v. O'Rourke, 97 Mont. 92, 33 P. (2d) 535; Ybarra v. Spangard, 25 Cal. (2d) 486, 154 P. (2d) 687, 162 A. L. R. 1258; Moore v. Steen, 102 Cal. App. 723, 283 P. 833; Brown v. Shortlidge, 98 Cal. App. 352, 277 P. 134; Ales v. Ryan, 8 Cal. (2d) 82, 64 P. (2d) 409; Armstrong v. Wallace, 8 Cal. App. (2d) 429, 47 P. (2d) 740; Pendergraft v. Royster, 203 N. C. 384, 166 S. E. 285.

one in the operating room who at the time was a servant of Dr. Linner and therefore under his control. In that connection the court said:

"* * * I might say that when I speak of the defendant here, Dr. Linner, I mean either he or any of the people who were working *under him* there in the operating room or assisting him." (Italics supplied.)

The court emphasized throughout the instructions that Dr. Linner would be responsible only if the lesion was caused by the negligence of someone working under his direction and control, and gave the following instructions at appellant's request:

"There is no evidence in this case that Dr. Linner *himself* failed to use skill and care in the diagnosis and treatment of Mrs. Jensen either before or after the discovery of the lesion on her leg, and I therefore instruct you that as a matter of law you cannot find him liable by reason of anything he *personally* did or did not do with respect to Mrs. Jensen's care and treatment." (Italics supplied.)

If there was justification at any time for a contention that there was a discrepancy and consequent confusion in the trial court's charge on this point, such confusion was dispelled when the jury returned for further instructions and was told:

"Well, as I have already stated to you, the doctor is the master in the operating room, and anybody who has anything to do with the surgical operation is the servant of the doctor, *and he is responsible for their conduct in the operating room during the process of this surgical procedure,* and any negligence on the part of any of the employees *during the process of this surgical procedure* is the responsibility of the doctor." (Italics supplied.)

No exception was taken to the part of the charge just quoted. The trial court then stated his recollection of what the doctor himself had said as to when his responsibility would end, to which exception was immediately taken by his counsel as a misstatement of fact. The court retracted the statement and told the jury to disregard what he had said and to rely upon their own memory of the testimony. The record indicates that Dr. Linner had said, generally, what the court in-

dicated. In any event, whatever occurred in the foregoing respect failed to constitute prejudicial error.

We think the facts show that the phenol burn occurred while Dr. Linner was conducting the appendectomy and that therefore the trial court's instructions were the only ones appropriate.

We see no error in the court's refusal to give certain instructions requested by appellant. The request for the submission of certain interrogatories was properly rejected in the exercise of the court's discretion.

While we have carefully considered all of appellant's assignments of error we have not found it necessary to refer to all specifically. It is our view that all have been disposed of at some point in this decision.

We therefore conclude that the verdicts are amply sustained by the evidence under appropriate instructions from the trial court and that the orders and judgments appealed from should be affirmed.

Affirmed.

MR. JUSTICE OTIS, not having been a member of the court at the time of the argument and submission, took no part in the consideration or decision of this case.