JEAN GREENBERG *et al.*, Plaintiffs-Appellants, *v.*, MICHAEL REESE HOSPITAL, Defendant-Appellee.

First District (2nd Division)   No. 78-926

Opinion filed September 25, 1979.—Rehearing denied November 20, 1979.

18

David S. Pochis, Ltd., and Alan D. Katz, both of Chicago, for appellants.

Lord, Bissell & Brook, and McKenna, Storer, Rowe, White & Farrug, both of Chicago, for appellee.

Mr. PRESIDING JUSTICE STAMOS delivered the opinion of the court:

Six plaintiffs, whose claims have been consolidated for purposes of appeal, filed complaints alleging that therapeutic radiation treatments administered by Michael Reese Hospital resulted in tumorous growths in the area of their thyroid glands. Plaintiffs predicate their cause of action on three theories—straight negligence, res ipsa loquitur and products/ strict liability. The trial judge ruled in favor of defendant Michael Reese, granting summary judgment on the negligence theory and dismissing the res ipsa loquitur and products liability counts. From these rulings, plaintiffs appeal.

During the 1940's and 1950's, upon referral by a family doctor or pediatrician, Michael Reese Hospital provided radiation therapy to children to treat and hopefully to cure hypertrophic lymphoid tissue of the pharnyx, an inflammatory and infectious throat ailment commonly known as enlarged tonsils and adenoids. Irradiation to shrink diseased tonsils and to eliminate infection had been developed in the 1920's as an alternative to surgical treatment. The deposition of defendant's medical expert explains that surgery, prior to the medical developments of the 1950's, ran the risk of anesthesia reaction, hemorrhage and infection (antibiotics were not generally available until the 1950's). Thus, radiation therapy was viewed as a "less risky" option.

In 1950, a study reported on 28 cases of thyroid cancer in children, 9 of whom had received radiation treatments, and concluded that a cause and effect relationship was not established. (Duffy & Fitzgerald, *Thyroid Cancer in Childhood and Adolescence: A Report of 28 cases*, 3 Cancer 1018 (Nov. 1950).) Notwithstanding this early report, subsequent studies debated the connection between radiation treatment and tumorous growths. Even though Michael Reese did not feel that a connection had been proved conclusively, the treatments were stopped.

In 1974, acting at the impetus of a University of Chicago study (Degroot & Paloyan, *Thyroid Carcinoma and Radiation: A Chicago Endemic*, 225 Jour. Amer. Med. Ass'n 487 (1973)), Michael Reese began a recall program for adults who had received the X-ray treatments as children. During examinations of the six plaintiffs represented herein, thyroid tumors, both benign and malignant, were found. Thereafter plaintiffs brought this action alleging that Michael Reese knew or should have known that the treatment was experimental and could result in unexpected side effects. Further, plaintiffs contended that there were studies available to the medical profession which suggested the potential dangers of this therapy; plaintiffs submitted the affidavit of a health physicist, Eli A. Port, to support their claims. Port's qualifications included training and education in radiological health physics and a Ph.D.

dissertation on Benefit vs. Risk in Pediatric Radiology. Michael Reese countered with an affidavit from Lionel Cohen, M.D., a radiation therapist, who is presently chairman of the Department of Radiation Oncology at Michael Reese Medical Center. Dr. Cohen's deposition, taken by plaintiffs, was submitted by Michael Reese in support of its contention that the use of therapeutic radiation to shrink tonsils was appropriately within the standard of care at the time of these treatments. Based upon the contents of Dr. Cohen's affidavit and deposition, the court below entered summary judgment in favor of Michael Reese on count I (negligence), and granted Michael Reese's motions to dismiss as to count II (res ipsa) and count III (products liability).

## I.

■■■ Plaintiff's initial contention is that the trial court erred in granting summary judgment on the negligence count. Under section 57 of the Civil Practice Act (Ill. Rev. Stat. 1977, ch. 110, par. 57), a motion for summary judgment is properly granted where the "pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Negligence issues generally are not susceptible to summary judgment (*Roucher v. Traders & General Insurance Co.* (5th Cir. 1956), 235 F.2d 423, 424), because it is the specific function of the jury to determine whether the applicable standard of care has been breached. (See Illinois Pattern Jury Instructions, Civil, No. 10.01 (2d ed. 1971) (hereinafter IPI Civil); Note, *Summary Judgment in Medical Malpractice Actions*, 7 Ga. St. Bar J. 470 (1971).) The applicable standard of care for these ordinary negligence cases has been labeled as that of the reasonable or prudent man, and further, as "a personification of a community ideal of reasonable behavior, determined by the jury's social judgment." (Prosser, Torts §32, at 151 (4th ed. 1971).) In malpractice cases however, the standard of care against which professional negligence must be measured is generally outside the common knowledge of the jury. Thus the rule has developed that plaintiff, except in the common knowledge or gross negligence situations (*Walker v. Rumer* (1978), 72 Ill. 2d 495, 381 N.E.2d 689), must offer expert medical testimony concerning the applicable standard of care in the community (*Stevenson v. Nauton* (1979), 71 Ill. App. 3d 831, 834, 390 N.E.2d 53, and cases cited therein), in order to meet his burden of going forward with the evidence. (*Borowski v. Von Solbrig* (1975), 60 Ill. 2d 418, 328 N.E.2d 301; see generally *Walski v. Tiesenga* (1978), 72 Ill. 2d 249, 256-57, 381 N.E.2d 279, and cases cited therein; *Stogsdill v. Manor Convalescent Home, Inc.* (1976), 35 Ill. App. 3d 634, 662, 343 N.E.2d 589.) Accordingly, where the issue is breach of standard of care and plaintiff

has failed to establish the standard by means of the affidavit or deposition of a doctor, summary judgment may be appropriately granted. Furthermore, if the defendant subsequently introduces expert medical testimony, it will suffice to set the standard of care in the absence of proper contradictory evidence by plaintiff. Where these circumstances exist, the court, as a matter of law, may grant summary judgment to the defendant. (See, *e.g.*, *Coleman v. Verson Allsteel Press Co.* (1978), 64 Ill. App. 3d 974, 980, 382 N.E.2d 36; *Gordon v. Oak Park School District No. 97* (1974), 24 Ill. App. 3d 131, 135, 320 N.E.2d 389.) Citing these cases, and using the above reasoning, Michael Reese contends that the trial court properly granted summary judgment because the affidavit and deposition of Dr. Cohen, Reese's medical expert, standing uncontroverted by any other "medical expert," is conclusive as to the relevant standard of care. On the other hand, plaintiffs assert that the affidavit of their expert, Eli Port, should be considered as evidence of standard of care sufficient, at a minimum, to create a factual dispute. The trial court disregarded Port's affidavit in granting summary judgment, ruling that the Illinois evidentiary standard required the testimony of a medical doctor to establish standard of care. We agree that medical expert testimony may be necessary in an action against a physician; yet, in the instant case, where it is a hospital that is being sued, we believe that the affidavit presented is sufficient to withstand a motion for summary judgment.

Where a factual dispute may exist, summary judgment must not be used to shortcut the trial process or preempt the right to trial by jury. (*Bell v. Board of Education* (1978), 67 Ill. App. 3d 402, 405, 385 N.E.2d 84; *Interlake, Inc. v. Harris Trust & Savings Bank* (1978), 57 Ill. App. 3d 524, 373 N.E.2d 413.) To determine whether a factual issue exists, pleadings, depositions, and affidavits must be construed "most strictly against the moving party and most liberally in favor of the opponent." (*Armagast v. Medici Gallery & Coffee House, Inc.* (1977), 47 Ill. App. 3d 892, 896, 365 N.E.2d 446.) When this standard is applied to the case at bar, the true issue becomes the evidentiary weight of the affidavit of Eli Port, since there is no factual dispute if that evidence is subject to preterition. While it is possible that plaintiffs would be able to obtain a more traditional medical expert prior to trial or would extract statements against defendant's interest from Dr. Cohen if they chose to examine him as an adverse witness under section 60 of the Civil Practice Act (Ill. Rev. Stat. 1977, ch. 110, par. 60), plaintiffs have made no such claims as bases for reversal of the summary judgment. (See, *e.g.*, Comment, *Medical Malpractice—Expert Testimony*, 60 Nw. U.L. Rev. 834 (1966).) Had such claims been properly presented, they may have afforded a common ground for the reversal of a premature summary judgment. (See *Bell v. Board of Educ.*) Here, however, plaintiffs stand on the affidavit of Eli

Port. Therefore the propriety of the summary judgment rests on the evidentiary question of whether a situation might exist where a health physicist is as qualified as a medical doctor to give testimony establishing standard of care for a hospital.

In *Darling v. Charleston Community Memorial Hospital* (1965), 33 Ill. 2d 326, 211 N.E.2d 253, *cert. denied* (1966), 383 U.S. 946, 16 L. Ed. 2d 209, 86 S. Ct. 1204, the measure of standard of care for a hospital was extended to include not only usual community practice, as in a case against a physician, but also administrative standards and bylaws. We are asked in the instant case to expand this evidentiary standard still more, to now encompass an affidavit from a nonmedical expert. The true issue in *Darling* was whether the procedures followed by employees of the hospital were sufficiently precautionary to insure safety of the patients. Here, the question goes even further, to whether the treatments should have been performed at the hospital in the face of dangers and warnings (taking the plaintiffs' affidavit as true for the purposes of this motion) about the possible side effects of radiation therapy. Both here and in *Darling* the defendant hospitals argued that a hospital's "duty is to be determined by the care customarily offered by hospitals generally in its community." (33 Ill. 2d 326, 331.) But as the *Darling* court indicated, custom is only relevant and not conclusive as to what the standard of care is or should be. See IPI Civil, No. 105.00, introduction to malpractice instructions (distinguishing the standard of care of doctors and physicians from that of hospitals: "Instructions covering hospitals * * * are not included in this section. For liability of a hospital see *Darling* * * *").

■■ Plaintiffs contend that a health physicist is the very person the hospital would consult if it had questions about its radiation program. (See *Natanson v. Kline* (1960), 186 Kan. 393, 350 P.2d 1093, 1108, clarified (1960), 187 Kan. 186, 354 P.2d 670.) If this is true, it would be incongruous to demand the testimony of a medical doctor when the hospital, seeking evaluation of its radiation program, might consult a health physicist. Dr. Cohen, defendant's expert, has impressive credentials and extensive involvement in tonsillar radiation. But the evidentiary standard which defendant contends applies is satisfied not so much by Dr. Cohen's experience in radiation therapy, as by his medical degree. Thus under defendants' theory the testimony of a doctor only vaguely acquainted with radiation therapy would ipso facto be competent (see generally *Ragan v. Steen* (1974), 229 Pa. Super. 515, 331 A.2d 724; Annot., 41 A.L.R. 2d 329, §7(6) (1970)), while that of a health physicist who might have designed the program would not. Such a strict evidentiary standard, which might result in the exclusion of relevant and material testimony (see *Natanson v. Kline* (1960), 186 Kan. 393, 350 P.2d 1093, 1108, clarified (1960), 187 Kan. 186, 354 P.2d 670), cannot be justified in the context of a

hospital's standard of care. A hospital is not a private practitioner. It has access to supportive services and experts in health related fields of which no single physician could be expected to be cognizant. (See Warshafsky, *Approaches to Hospital Negligence*, 79 Case & Comment 12 (Sept.-Oct. 1974).) Thus we feel that it is only reasonable to hold the hospital to a standard of care established by quasi-medical consulting experts.

Upon reading the record, one clear question arises: did the defendant hospital know or should it have known with the exercise of ordinary care the dangers of radiation therapy? When the material presented by both experts is considered, a disputed issue of fact clearly exists. If the hospital knew or should have known, customary practices and its self-created standard of care cannot act to bar liability. (See generally Rheingold & Davey, *The Standard of Care in New York Medical Malpractice Cases*, 45 N.Y.S. B.J. 98 (1973).) Judge Learned Hand's reasoning seems particularly apt: "Indeed in most cases reasonable prudence is in fact common prudence; but strictly it is never its measure; a whole calling may have unduly lagged in the adoption of new and available devices. It never may set its own tests, however persuasive be its usages. Courts must in the end say what is required; there are precautions so imperative that even their universal disregard will not excuse their omission." (*The T. J. Hooper* (2d Cir. 1932), 60 F.2d 737, 740.) *Accord*, Prosser, Torts §33, at 166-68 (4th ed. 1971); Note, *Medical Malpractice: The Standard of Care*, 10 Gonzaga L. Rev. 220 (1974). See also *Canterbury v. Spence* (D.C. Cir. 1972), 464 F.2d 772, 783-85, *cert. denied* (1972), 409 U.S. 1064, 34 L. Ed. 2d 518, 93 S. Ct. 560; *Toth v. Community Hospital* (1968), 22 N.Y.2d 255, 263, 292 N.Y.S. 2d 440, 447-48, 239 N.E.2d 368, 373.

■■ The pleadings, affidavits and deposition reduced this case to a "dispute between the contestants to one or more propositions of fact, of which one side asserts the truth and which the other denies." (L. Hand, *Historical and Practical Considerations Regarding Expert Testimony*, 15 Harv. L. Rev. 40, 50-51 (1902).) At this stage, the testimony of expert witnesses, subject to the scrutiny of cross-examination, is an essential aid to the jury charged with determining the applicable standard of care in a professional negligence case. Therefore, we find that a health physicist, depending on his personal qualifications, may be competent to offer testimony establishing standard of care for a hospital. Accordingly, we vacate the summary judgment and remand for further proceedings as to count I of plaintiffs' complaint.

## II.

Plaintiffs' second count also sounds in negligence. However, instead of pleading specific acts of negligence as in his first count, plaintiff now is relying on the inferential effect of the doctrine of res ipsa loquitur.

Generally, negligence is not presumed or inferred, but must be proved from the facts. (*E.g.*, Prosser, Torts §39, at 211-12 (4th ed. 1971).) Even so, the device of res ipsa loquitur, as first applied in *Byrne v. Boadle* (1863), 2 H. & Co. 722, 159 Eng. Rep. 299, allows the "thing [to] speak for itself," and once presented, operates to shift the burden of going forward to defendant. "It means simply that in certain circumstances the mere fact of an injury may give rise to an inference that the person who caused the injury is guilty of negligence." (Comment, *Medical Malpractice—Expert Testimony*, 60 Nw. U.L. Rev. 834 n.2 (1966).) Therefore, this procedural device, once pleaded and introduced during plaintiffs' case, would avoid a directed verdict and force Michael Reese to present evidence as to why it was not negligent to administer tonsillar irradiation treatments.

■■ To avoid shifting the burden to defendant whenever a negligent act is alleged, certain rules have developed governing the usage of res ipsa loquitur. Traditionally, res ipsa loquitur will "apply only when a layman could infer as a matter of common knowledge that the injury would not have occurred unless the defendant was negligent" (Comment, *The Application of Res Ipsa Loquitur in Medical Malpractice Cases*, 60 Nw. U.L. Rev. 852, 857 (1966) (footnote and emphasis omitted)). This application emphasizes the facts surrounding the original act instead of the "bad result." A bad result, without more, is hardly enough to raise an inference of negligence. (See Adamson, *Medical Malpractice: Misuse of Res Ipsa Loquitur*, 46 Minn. L. Rev. 1043, 1047 (1962).) In the professional negligence area, the recognition of the applicability of res ipsa conditioned only on a bad or unanticipated outcome to the treatment or litigation, would result in a presumption of negligence based upon result rather than any negligent act. This special class of defendants, solely because of the risk-laden nature of their profession, would thus become, in effect, guarantors of result, and would have the burden of constant justification of their acts in the light of this recurring "presumption of negligence."

■■ The use of res ipsa loquitur is of relatively recent development in the medical malpractice area and, based in part on the above policy considerations, has been limited to those acts of gross lack of due care which by the very nature of their result provide circumstantial evidence of negligence. (See *Piacentini v. Bonnefil* (1966), 69 Ill. App. 2d 433, 217 N.E.2d 507 (sponge in patient's body); *Hall v. Grosvenor* (1932), 267 Ill. App. 119 (sponge in body); *Tiller v. Von Pohle* (1951), 72 Ariz. 11, 230 P.2d 213 (cloth sack in body); *Madis v. Stellwagen* (1951), 38 Wash. 2d 1, 227 P.2d 445 (needle in eye); *Jensen v. Linner* (1961), 260 Minn. 22, 108 N.W.2d 705 (damage to part of body remote from operation).) Where the jurors' common knowledge does not provide the inference, modern extensions of the law have recognized that expert evidence may be

introduced to give the jurors a basis for understanding the nature of the alleged negligent act. (*Walker v. Rumer* (1978), 72 Ill. 2d 495, 381 N.E.2d 689; Restatement (Second) of Torts §328 D, comment d (1965).) Thus, either common knowledge or expert evidence can afford a basis for invoking the procedural device of res ipsa loquitur.

Recently the Illinois Supreme Court clarified the scope of the trial court's considerations on a motion to dismiss a res ipsa loquitur count. It is the proper function of the trial court, even at the pretrial motion stage, to determine the appropriateness of res ipsa loquitur to the facts of the case presented. (*Walker v. Rumer* (1978), 72 Ill. 2d 495, 381 N.E.2d 689.) Plaintiffs contend that res ipsa loquitur is proper in tonsillar irradiation cases because of the close parallel to radiation burn situations where res ipsa historically attends. (See *Holcomb v. Magee* (1920), 217 Ill. App. 272; *Johnson v. Marshall* (1926), 241 Ill. App. 80; *Adamsen v. Magnelia* (1935), 280 Ill. App. 418.) However, we believe that radiation burns, typically the result of an unintentional or accidental application of excess radiation, are far different from tumor development, usually a product not of accidental overdosage but an unanticipated long term side effect of planned treatment.

The inferences to be drawn from the two types of cases are different and distinguishable. In the radiation-burn cases, the reasoning takes two steps: first, that there is no medical reason to use radiation sufficient to cause extensive burns; and, second, that the doctor in fact used excess radiation and therefore was negligent. Here, however, plaintiffs concede that irradiation of tonsils was a widely used therapeutic treatment, specifically chosen by the referring physician in the light of surgical dangers and poliomyelitic implications. The only possible inference which res ipsa loquitur could provide in the case at bar is that tumors, having resulted in some percentage of cases from either organic or external stimulus, are the result of negligent medical judgment. Res ipsa loquitur arises from a clearly negligent act (*i.e.*, application of excessive doses of radiation) which leads to an almost certain outcome (radiation burns). Unlike these radiation-burn cases, the original diagnostic decision to use tonsillar irradiation is at best debatably negligent. Whether or not a medical judgment to use an alternative form of therapy is legally negligent is properly contested at trial, and should not be subject to a presumption of negligence arising solely from the bad result. See generally *Voss v. Bridwell* (1961), 188 Kan. 643, 364 P.2d 955; Comment, *Res Ipsa Loquitur and the Calculated Risk in Medical Malpractice*, 30 So. Cal. L. Rev. 80 (1956); Note, *Malpractice and Medical Testimony*, 77 Harv. L. Rev. 333 (1963); *cf. Wade v. Ravenswood Hospital Association* (1954), 3 Ill. App. 2d 102, 120 N.E.2d 345.

■■ Since the question of negligence can be developed and litigated on

the merits, and since there is no allegation that defendant has such superior knowledge of the true facts surrounding the treatments as to hamper plaintiffs' presentation of their claims, we find that the doctrine of res ipsa loquitur is inapplicable. Therefore, we affirm the trial court's dismissal of count II.

### III.

■■ Our decision on count III, the application of product liability theory to tonsillar irradiation treatments, is governed by our recent decision in *Dubin v. Michael Reese Hospital* (1979), 74 Ill. App. 3d 932, 393 N.E.2d 588.) We accordingly reverse the trial court's dismissal of the products liability count and remand for further proceedings consistent with that opinion.

Affirmed in part; reversed and remanded in part.

PERLIN and HARTMAN, JJ., concur.