# MARGARET WILLIAMSON v. R. N. ANDREWS AND OTHERS.[1]

December 4, 1936.

No. 30,941.

*Cobb, Hoke, Benson, Krause & Faegre, Raymond A. Scallen, Pfau & Pfau,* and *C. J. Laurisch,* for appellants.

*Flor & Reim,* for respondent.

JULIUS J. OLSON, JUSTICE.

In an action to recover damages for alleged malpractice plaintiff recovered a verdict for $3,000. Defendants' blended motion for judgment notwithstanding or new trial was denied, and they appeal.

[1]Reported in 270 N. W. 6.

Plaintiff, a young lady 26 years of age at time of trial (September, 1935), on February 11, 1934, suffered a comminuted fracture of the tibia (shin bone) of her right leg about five inches below the knee joint. She was immediately taken from the place of accident to defendants' clinic in Mankato. Defendant Dr. Stillwell took her case in hand. X-ray pictures of the fracture were taken, and as soon as these were available for interpretation the fracture was reduced. A plaster of •Paris cast was prepared and applied extending from above the knee to below the ankle. She was taken to her home within two hours after the accident occurred. That afternoon and evening she suffered pain and could not sleep very well during the following night. The cast seemed to hurt her. During the afternoon Dr. Andrews, one of defendants, called and opened the cast to some extent so as to relieve the pressure. The next day Dr. Stillwell was called and he opened the cast further so as to relieve the pain with which she claimed to be suffering. It is customary so to. do when the patient complains of pain.

At the time of the first application of the cast, so plaintiff testified, she felt as if the ends of the broken bone had slipped, and she claims that she called the doctor's attention thereto; that the doctor assured her this could not be so because the cast would prevent such result. There is also testimony on her part that she thereafter repeatedly made these statements to the doctor and in each instance was informed that she must be mistaken. On February 26 plaintiff was again examined by defendant and another X-ray taken. It then appeared that there was a slight overlapping of the ends of the bone, in other words, that they were not in perfect juxtaposition. Accordingly, plaintiff was taken to a hospital and the so-called Brown splint applied. Briefly this may be described as follows: A small wire is put through the skin back of the tendon of the heel. To get the required pull a weight is applied. The limb is left exposed so that it may be massaged. This stretching apparatus was maintained from February 27 to March 16. It was then found that the bone was in perfect position. Another plaster of Paris cast was then put on the injured limb, and plaintiff was taken from the hospital back to her home. She was later examined

on several occasions by Dr. Stillwell, in each instance she complained of pain, but the doctor could see nothing indicating any undue swelling or other condition indicating anything except a normal and gradual healing development considering the kind of fracture with which she was suffering. On March 24 the cast was partly opened to relieve pressure and pain. She returned to her work as a stenographer on April 7, and on April 13 called at the clinic, at which time the cast was removed. She again went back May 1. There was nothing out of the usual found. The union of the ends of the bone was in good shape. The bone was well healed. There was little or no swelling. But she did complain of pain, especially at night. She again called May 26 and complained about pain in her knee and ankle, also soreness and stiffness in the region of the injury. She was advised to have diathermy treatment. Two such were duly given, May 26 and again on May 29. After these treatments she made no further complaint to Dr. Stillwell except that on August 10, while walking along the street using a cane, she met the doctor, who asked about her condition. She said that she was still suffering pain in and around the knee and ankle. After May 29 the defendants were in no manner consulted nor have they since then treated her.

In her childhood plaintiff had been taken ill with infantile paralysis. This left her right limb somewhat crippled. Some eight or nine years prior to her present injury she had undergone two operations on this leg at the Gillette Hospital in St. Paul. These operations and other treatments much improved her condition, although this leg was somewhat shorter than the other so that she walked with a slight limp.

On August 11 plaintiff went to Dr. Lloyd. He found her right leg swollen and red. She complained to him of pain and discomfort. He took an X-ray picture. From this and her story he inferred that the pain with which she was suffering probably involved some inflammatory bone process. It indicated to him some sort of bone infection. The X-ray, as he interpreted it, indicated inflammation in the bone. This inflammation, so he testified, all appeared above the fracture itself. Such inflammation need not necessarily be in-

fectious. At any rate, he considered her condition to be such that a bone specialist should be employed, and he accordingly sent her to the Mayo Clinic at Rochester. There she was treated on several occasions. Dr. Meyerding of that clinic was the expert taking her treatment in hand. Both he and Dr. Lloyd testified, and they were the only medical witnesses testifying, for plaintiff. Between May 29 and August 11 she did not go to any doctor nor was she treated by anyone.

We have carefully examined the testimony of Dr. Meyerding, and from a reading thereof it is obvious that there was nothing respecting defendants' treatment of the case that he deemed subject to criticism. He freely conceded that the inflammatory process in and about the injured bone was not caused by anything done or omitted to be done by Dr. Stillwell. Dr. Lloyd could not form, nor did he venture, an opinion as to the cause or when any inflammation or infection, if such there was, actually came into play. It is conceded by all the experts that there is always some inflammation naturally and necessarily flowing from such fracture.

Dr. Meyerding first saw plaintiff August 27, at which time he examined her. He found the fractured bone in excellent position. From his examination of plaintiff and her history he concluded that this was a complicated case, largely because of the background of infantile paralysis. Accordingly, a biopsy was performed on September 7, the purpose of which was to ascertain by bacteriologists and pathologists of the Mayo Clinic whether there was an infection in the bone itself. An incision was made and a small particle of the bone removed for this purpose. The doctor accepted with reservations the report of the pathologists that there was a chronic inflammation of the bone. He doubted that the ordinary pathologist would be able to differentiate the condition found from that commonly flowing from an injury such as plaintiff suffered. He testified definitely that diathermy is a proper and recognized treatment for inflammation of the bone. In his opinion it is purely speculative as to when the bone inflammation starts or becomes manifest; and he attributed some of the changes in plaintiff's right leg as compared with her left to her old infantile paralysis affliction.

That there was no infection found by the doctor is apparent because the incision was closed and no drainage provided for.

It appears beyond question that it takes considerable time for a person to recover fully from a comminuted fracture. The healing process causes pain and discomfort. No one can state definitely the healing time. It differs in each individual case, and no rule can be laid down as to the time within which such fracture will fully heal. As a matter of fact, we cannot find anything in the case indicating when the inflammation commenced or its cause.

With regard to the ultimate result, one of counsel for plaintiff in closing the case to the jury candidly admitted that the bone "grew together in a way that has been praised by every doctor and is entirely satisfactory to us."

As has been said, Dr. Meyerding found nothing professionally wrong or negligent on the part of Dr. Stillwell. We think this is significant. This question was asked by counsel for defendant: "There is nothing in this record to make you assume that Dr. Stillwell used anything other than ordinary and regular skill, is there, doctor?" The question was objected to as not proper cross-examination and sustained. And further: "Q. There is nothing you have in any way to criticize about his treatment [Dr. Stillwell's], is there, doctor?" A similar objection was made and sustained. The situation then simmers down to this: Dr. Lloyd believed the case to be one requiring the expert services of a bone specialist. A recognized specialist was secured. The man so selected failed to find anything wrong either by way of commission or omission on the part of the attending doctor. The injured plaintiff has fully recovered. But she thinks Dr. Stillwell should have done something (just what is left a dark secret) to discover an inflammatory condition in her leg. Liability is sought to be fastened because, as said in her brief: "We claim that it is not necessary for us to prove that Dr. Stillwell caused by his negligence, this inflammation. He is liable because he negligently failed to make any diagnosis, or attempt to diagnose or discover that plaintiff, while under his care, was suffering from inflammation of the bone, thus extending and

increasing the affliction, the period of the cure, the pain and suffering, and the expense."

In her complaint plaintiff alleged that Dr. Stillwell "injected an anesthetic into the leg of the plaintiff and particularly the wound caused by the fracture for the purpose of alleviating the pain which plaintiff was then suffering, and as a preliminary to the setting of said fracture and for that purpose, said attending physician used a hypodermic needle"; that he "carelessly and negligently permitted infectious germs to enter said wound and leg of the plaintiff and that such germs were by reason of the carelessness and negligence of said attending physician, introduced into said leg and the wound caused by the fracture." There was no proof of any such act or acts of negligence. That is why her counsel at the end of the trial had to concede that no claim was made that any inflammation in her leg was caused by the doctor's negligence. The only theory upon which plaintiff seeks recovery is, as we have quoted from counsel's remarks, that defendant *"negligently failed to make any diagnosis,* or attempt to diagnose or discover *that plaintiff,* while under his care, *was suffering from inflammation of the bone."*

■ Malpractice cases are not new. Many have been before this court. The duties and liabilities of physicians and surgeons are well known to the profession.

"A physician and surgeon is not an insurer of a cure or good result of his treatment or operation. He is only required to possess the skill and learning possessed by the average member of his school of the profession in good standing in his locality, and to apply that skill and learning with due care." Yates v. Gamble, 198 Minn. 7, 12, 268 N. W. 670, 673.

No one questions Dr. Stillwell's qualification. He is an experienced physician and surgeon in good standing and possessed of perhaps more than "the average skill" of members of his profession practicing in his community. Of course this does not relieve him and his copartners from liability if he failed to exercise the degree of skill and care required by the quoted language.

As we have already pointed out, the record is barren of expert medical testimony that the inflammatory process in and about the bone of plaintiff's leg was caused by anything done or omitted to be done by Dr. Stillwell. Neither of plaintiff's experts gave any opinion as to when this inflammation, other than such as naturally and necessarily resulted from the fracture, commenced or what caused it. Obviously, this is a case where opinion evidence of competent medical experts is necessary to establish liability. Quickstad v. Tavenner, 196 Minn. 125, 264 N. W. 436. That case covers the question of the care, skill, diligence, and learning required and to be exercised by a physician or surgeon. The measure to be applied is whether the physician and surgeon in fact [196 Minn. 128] "conducted the operation according to an accepted standard of his profession."

In this, as in negligence cases in general, there must be proof of causal connection between the wrong complained of and the resulting injury. The burden of proving such negligent conduct rests upon plaintiff. As was said in Yates v. Gamble, 198 Minn. 7, 14, 268 N. W. 674:

"The burden is on plaintiff to show that it is more probable that the harm resulted from some negligence for which defendant was responsible than in consequence of something for which he was not responsible."

Plaintiff's proof failed to show that the condition of which she complains was due to the treatment or lack of treatment on defendants' part. The verdict has for its support only conjecture and speculation. Martin v. Courtney, 87 Minn. 197, 91 N. W. 487.

Thus far we have commented only upon the medical testimony for plaintiff. We think it is proper to remark that for defendants many men of the highest standing in the profession testified. They are all of opinion that Dr. Stillwell's professional conduct was in all respects proper. They found no condition in plaintiff's leg as evidenced by the many X-rays taken and introduced at the trial other than the natural and normal callous condition produced in nature's own way in the process of healing a broken bone. This

process is painful, but necessary, particularly in cases of plaintiff's type, where there was a splintered fracture and much damage done to the periosteum, the muscles, and nerves in the injured region of the fracture.

We conclude that the evidence presented does not warrant a verdict for plaintiff in any amount, hence that the order should be reversed and the trial court directed to enter judgment for defendants notwithstanding the verdict.

So ordered.