MARGARET SCHULZ AND ANOTHER v.
DR. DAVID W. FEIGAL AND OTHERS.

142 N. W. (2d) 84.

April 7, 1966—No. 39,636.

*Burns & Rossi* and *Thomas F. Burns,* for appellants.

*Rider, Bennett, Egan & Johnson* and *Chester D. Johnson,* for respondents.

MURPHY, JUSTICE.

This is an appeal from an order of the trial court denying appellants' motion for a new trial in a negligence action. It is contended that the trial court erred in refusing to submit to the jury the issue as to whether plaintiff Margaret Schulz' injury for which she seeks to recover was the proximate result of the admitted negligent act of the defendant physicians' employee.

From the record it appears that in August 1960 Mrs. Schulz, who at that time was 55 years of age, was a patient of defendant Dr. David W. Feigal. She had been his patient since 1956 when she suffered a heart attack. She had another attack in 1959 but by January 1960 had made a satisfactory recovery. In July 1960, Mrs. Schulz had an eye irritation which Dr. Feigal diagnosed as resulting from a vitamin deficiency. He prescribed daily $B_1$ and $B_{12}$ vitamin "shots" and dark glasses. The vitamins were injected into her hip by either Dr. Feigal or one of his technicians.

On August 3, 1960, Mrs. Schulz came to Dr. Feigal's office for an injection. At that time Dr. Feigal was out, and the injection was given by one of the employees, defendant Genevieve Smerdon, who had training in medical technology and was experienced in the giving of injections. Instead of giving the prescribed vitamin injections, Mrs. Smerdon mistakenly administered a combination of $B_{12}$ and adrenalin. She immediately realized her mistake and conducted Mrs. Schulz to the electrocardiogram room, which was part of the doctors' suite, and had her rest on a cot there. Shortly thereafter, Dr. Feigal, who had been attending a luncheon, was located by one of the technicians from defendant physicians' office. He was advised of Mrs. Schulz' condition and immediately returned to the office. After the adrenalin was administered, Mrs. Schulz experienced various reactions as a result of the increased speed of her metabolism, including chills, rapid pulse, headaches, sensations of choking, and inability to speak. On Dr. Feigal's return, he examined her with a stethoscope, administered Sparine, a tranquilizer, and took two electrocardiograms.

The Sparine was calculated to counteract or neutralize the effect of the adrenalin injection. It was apparently Dr. Feigal's intention that Mrs.

Schulz remain in the electrocardiogram room until she had sufficiently recovered so that she could be sent home or to the hospital. While she was in this room, she was ill and nauseated and left it unobserved to go across the hall to the washroom. At that point she fainted and fell as a result of which she sustained certain injuries. After the fall, she was found by members of the doctors' staff, who arranged to have her taken by ambulance to the hospital where she remained for two days. She had deep abrasions in her center lower back. She was referred to Dr. Paul Gustafson who treated her up to the time of trial. She was hospitalized on three occasions for varying lengths of time thereafter. Her condition, resulting from the fall, was diagnosed as a hip wrench, and Dr. Gustafson gave as his opinion that she had suffered a 10-percent permanent partial disability of her right leg and 8-percent partial disability of her whole body. The evidence indicates that Mrs. Schulz had a history of fainting spells, extending from before her heart attack in 1955 to after her fall in 1960. It was the opinion of doctors on both sides that part of her difficulty resulted from a neurosis or functional overlay, which could not be explained by objective findings.

The jury, in accordance with the court's instructions, returned a nominal verdict for the plaintiff, limited to damage sustained by the negligence of the doctors' employee in administering the adrenalin. The trial court considered that the fall was something apart from the negligent administration of the adrenalin and resulted from some independent or intervening cause, for which the defendants were not causally responsible. The jury was told, in substance, that the effect of the defendants' negligence terminated with the administration of the tranquilizer and that plaintiff could recover for damage caused by the fall only if they found there was a "negligent lack of supervision or care for her *after* the administration of the counteracting Sparine." (Italics supplied.) They were told, however, that they could consider the defenses of contributory negligence and assumption of risk. The instruction to which the plaintiff objects is this:

"* * * the Court instructs you as a matter of law that the giving of the mistaken administration of Adrenalin instead of the intended injection of $B_1$ was negligence on the part of the administrator of that injec-

tion. Now, while I instruct you that that is negligence, nevertheless you cannot award damages to the plaintiffs on account of the alleged injury sustained by Mrs. Schulz in the toilet room unless you find that there was a negligent lack of supervision or care for her after the administration of the counteracting Sparine. If you find that there was not a negligent lack of supervision or care, or if you find that Mrs. Schulz was negligent herself or assumed the risk in attempting to go to the toilet room herself, then the damages, if any, which you may award must be limited to such damages, if any, that you find from the evidence were sustained by the plaintiffs from the temporary effects of the mistaken Adrenalin injection."

The plaintiffs contend that this instruction was in error in that it incorrectly assumes that there was no evidence from which the jury could find that the fall and consequent injuries were the natural and proximate result of the original negligent act.

Before discussing the law which we think is applicable to the facts in this case, it may be observed that, since the suit was one against physicians and their employees based on negligence, the trial court assumed that his instructions should somehow be geared to the well-established rule that a physician or surgeon is not an insurer of a good result of his treatment and that he is only required to possess the skill and learning possessed by the average member of the school of his profession in good standing in his locality and to exercise that skill and learning with due care. 14 Dunnell, Dig. (3 ed.) § 7488. It is also ordinarily recognized in such an action that whether the treatment was negligent cannot be determined by a jury of laymen without the opinion of medical experts.

It is unnecessary here to review the innumerable authorities dealing with the various facts and situations to which this rule has been applied. They are gathered and reviewed in the recent decision of Miller v. Raaen, 273 Minn. 109, 139 N. W. (2d) 877, which involved asserted negligence on the part of an anesthesiologist in administering an anesthetic which infiltrated the tissues of the patient's hand, causing damage. In that case, we observed that the infiltration of anesthetic "can and does occur even though no one is negligent." The record indicated there that individuals have different tolerances for the particular drug given. "Whether defend-

ant should have noticed that something was wrong sooner than he did and taken corrective action as a result is a matter beyond the common knowledge of laymen." 273 Minn. 118, 139 N. W. (2d) 883. In that case, there was an absence of expert medical testimony to establish negligence on the part of the defendant physician.

We noted, however, as we have in numerous other cases, that expert testimony is not necessary in cases where the nature of the alleged negligent conduct is such that inferences to be drawn from the facts are within the range of common experience of men and where jurors are equally as capable of drawing inferences as are experts. In such a case, "the mode of treatment having been shown, the practical common sense of the jury will enable them to determine that the injury or failure of cure is owing to unskilful or negligent treatment." Getchell v. Hill, 21 Minn. 464, 465.

These principles were recently recognized in Jensen v. Linner, 260 Minn. 22, 108 N. W. (2d) 705. In that case, we held that there was sufficient evidence to sustain a finding of a surgeon's negligence in connection with the use of phenol which caused a burn on the patient's leg during the course of an operation. There was no expert medical testimony as to standards of practice in the use of phenol, a drug employed for cauterization in the process of surgery. The defendant contended that expert medical testimony was required to show causal connection between the phenol and the resulting injury. We held that it was not necessary to prove facts to an absolute certainty, and it was sufficient merely to establish facts from which inferences might be drawn by the jury. We said (260 Minn. 36, 108 N. W. [2d] 714):

"Plaintiff is not required to prove causal connection by direct evidence. If circumstantial evidence furnishes a reasonable basis for the inference that negligence of the doctor herein was the cause of the phenol burn, the case should be submitted to the jury. Clark v. George, 148 Minn. 52, 180 N. W. 1011.

"This court has said that there may be cases where, the mode of the treatment having been shown, the practical common sense of the jury will enable them to determine that the injury or failure of cure is owing to unskillful or negligent treatment. Getchell v. Hill, 21 Minn. 464. This

court has also said that there are cases where the layman may draw permissible inferences in relation to causal connection without the aid of medical expert testimony."

In the case before us, there is obviously no need for medical testimony to establish negligence on the part of the defendants. No one would contend that the giving of a mistaken adrenalin dose to a heart patient accords with the usual degree of care and skill required of the physician. The only question is whether the injury sustained by the fall was a natural and proximate result of the primary negligent act for which the defendant physicians may be liable under the doctrine of respondeat superior.

It is well recognized that the rule that a verdict in a malpractice case cannot be based on speculation or conjecture as to cause does not necessarily require that the plaintiff prove causation by direct and positive evidence which excludes every other possible hypothesis as to the cause of the injuries. Generally, it is held that, after a fair preponderance of evidence discloses facts and circumstances proving a reasonable probability that the defendant's negligence or want of skill was the proximate cause of the injury, the plaintiff has supported his burden of proof sufficiently to justify a verdict in his behalf. Annotation, 13 A. L. R. (2d) 11, citing Clark v. George, 148 Minn. 52, 180 N. W. 1011; Ellering v. Gross, 189 Minn. 68, 248 N. W. 330; Yates v. Gamble, 198 Minn. 7, 268 N. W. 670; and Williamson v. Andrews, 198 Minn. 349, 270 N. W. 6.

The question of proximate cause must be considered in light of the rule expressed in Christianson v. Chicago, St. P. M. & O. Ry. Co. 67 Minn. 94, 97, 69 N. W. 640, 641. So far as that rule is applicable here, it states:

"* * * [T]he law is that if the act is one which the party ought, in the exercise of ordinary care, to have anticipated was liable to result in injury to others, then he is liable for any injury proximately resulting from it, although he could not have anticipated the particular injury which did happen. Consequences which follow in unbroken sequence, without an intervening efficient cause, from the original negligent act, are natural and proximate; and for such consequences the original

wrongdoer is responsible, even though he could not have foreseen the particular results which did follow."

It should be recognized that an intermediate cause does not become a superseding cause if it is a normal response to what might be expected as a reaction to the original wrongful act. In Purcell v. St. Paul City Ry. Co. 48 Minn. 134, 138, 50 N. W. 1034, 16 L. R. A. 203, 205, it was said:

"There may be a succession of intermediate causes, each produced by the one preceding, and producing the one following it. It must appear that the injury was the natural consequence of the wrongful act or omission. The new, independent, intervening cause must be one not produced by the wrongful act or omission, but independent of it, and adequate to bring about the injurious result. Whether the natural connection of events was maintained, or was broken by such new, independent cause, is generally a question for the jury."

With these legal principles in mind, our attention may be focused more closely on what actually happened during the approximate 2-hour period while Mrs. Schulz was in the defendant physicians' offices on the afternoon of August 3, 1960. The record tells us that, after the adrenalin injection, Mrs. Schulz went into the "shakes," her head "hurt terrifically," she was chilled, and the nurse covered her with a blanket. She tried to talk and felt "as though I was choking." She was not clear as to everything that occurred after Dr. Feigal came on the scene. She said he told her, "I am going to give you something to counteract the Adrenalin. * * * This will make you relax. * * * I want you to lay down and be perfectly quiet and you'll sleep for a while." After the shot was given to counteract the adrenalin, she testified that she had severe head pains. She vaguely remembered, "I was very nauseous and I just thought if only I could make the bathroom, because I expected all sorts of accidents. * * * I don't ever remember going to the bathroom. How I got in the bathroom, or how I got out. * * * I remember being put on the stretcher and they put the oxygen on my nose as we drove out [in the ambulance]."

Dr. Feigal testified that, when he first returned to his office, he found

Mrs. Schulz lying on the electrocardiogram table. He said that she exhibited the classic symptoms of an adrenalin overdose. "She was shaking, jittery, complaining of some pain in her head — headache, in other words — and pulse was pounding. These are all normal symptoms." He explained that the adrenalin injection "could have been terrifically harmful to Mrs. Schulz because she had a previously known sclerotic heart disease." He admitted that he was "terribly concerned about this patient, and even more so because of the accidental injection." He explained that the adrenalin had been distributed through the blood-stream by the cardiovascular system to other parts of the body which reacted to it. To correct this imbalance in her metabolism, he chose to administer a tranquilizer. From experience with Mrs. Schulz, he felt that she could tolerate Sparine, and, after an injection, he said, "[S]he immediately stopped shaking and felt a lot better. She began to rest. She got sleepy." He testified that patients invariably get sleepy from intravenous injections of this particular drug. It is calculated to "control excitation." The doctor said that patients do not all react to it the same way. "I have used it to try to knock out too many patients unsuccessfully to have much faith in knocking anybody out with Sparine. I suppose occasionally it could be a good knockout agent." He explained that it is used in the treatment of emotional illness and disorders, to ameliorate the withdrawal symptoms of drug addiction, and is standard treatment for acute alcoholism and delirium tremens. It is apparent that the testimony of the doctor, as it relates to the known effects of the drugs administered to Mrs. Schulz, corroborates her testimony to the effect that at no time did she recover from their impact so as to return to a normal mental, physical, and emotional state.

The evidence, as it bears upon the care and treatment of Mrs. Schulz while she was suffering from the ill effects of the drugs administered to her, should be examined. Dr. Feigal testified that, after he gave her the second electrocardiogram, "She was resting, was calm, color was good, wasn't shaking. From all that I could tell she seemed very normal." Later, he apparently revised the correctness of this observation by saying, "[A]fter she had fallen in the bathroom, I began to wonder if she was as well as I thought she was. And I thought maybe she should be in the

hospital. So I called an ambulance." While Mrs. Schulz was in the EKG room prior to her fall, it was Dr. Feigal's impression that she was "lying there sleeping." He also stated that both he and members of his staff were occupied with other duties. Mrs. Smerdon was busy with laboratory work, "doing hemoglobins and white counts." He testified, "There were other people there. There were the demands of other sick people; the demands of a physician, myself. * * * I needed help with many of my other cases. With one person watching Mrs. Schulz we were under-staffed." He said that "although we didn't stay continuously with her, we were sort of popping in on her and checking on her." He conceded that no specific orders were given for anyone to watch Mrs. Schulz and said, "We were waiting for her to get a little more alert and get feeling a little better. And then we were going to try to get her up and send her home." Although Mrs. Schulz was sleepy before her fall, he gave as the reason for her failure to request assistance in going to the washroom that she "was afraid she was going to be a trouble to us." He denied that he told Mrs. Schulz at the hospital that she had been given "enough adrena-lin to kill a horse."

We do not think that additional discussion is necessary to demonstrate the causal connection between the fall which caused the injury and the primary negligence. The events giving rise to Mrs. Schulz' condition followed in uninterrupted sequence from the giving of the adrenalin to the time she was found either in a faint or in a stupor.

It is our view, moreover, that the rational and natural inferences which follow from the sequence of events here proved are sufficient to establish a causal connection without supporting medical testimony. The causal relation is not hidden from the lay mind by the mysteries of medical science. It is within the common knowledge of jurors from wide informa-tion of the social and health problems created by the general use of tranquilizers that their use produces an unnatural impact on the mental, physical, and emotional structure and may cause disorientation. We think the trial court was in error in dividing into two separate episodes the events which occurred in the defendant physicians' offices. Mrs. Schulz' reactions to the Sparine cannot be considered apart from her reactions to the adrenalin. The record contradicts the claim that the

Sparine injection restored the plaintiff to her normal condition. On the contrary, the record is persuasive to the effect that the Sparine set in motion a new phase of disorientation. There was evidence from which the jury could consider whether the plaintiff's fall was the final event in a web of circumstances woven together in a short period of time. It must be inferred that she fell because of her impaired physical condition. The events which preceded the fall all contributed to that impairment. Through the admitted negligence of the defendant physicians' employee, she was given an injection which created a seizure which interfered with the normal functions of her system and caused her to have reactions indicating possible danger to her heart condition. The jury could find that the effects of the tranquilizer, or the combined effects of the tranquilizer and the adrenalin, were a state of drowsiness, confusion, nausea, and illness which compelled Mrs. Schulz' attempt to go to the washroom. It seems to us that this succession of events, unbroken by any event for which she could be blamed, flowed from the original negligent act and that there was evidence from which the jury could find that her collapse was a natural and proximate result of that act.

Reversed and new trial granted.

KNUTSON, CHIEF JUSTICE (concurring specially).

I concur in the result that there should be a new trial. The instructions of the trial court were too restrictive. The case differs from many others in that here proof of original negligence on the part of the defendants was established beyond any doubt. The question really is whether the negligence in administering adrenalin instead of the drug that was supposed to be injected, and the attempt to neutralize the effect of such drug, caused a physical condition which continued until plaintiff Margaret Schulz fell, resulting in her final injury. It is not a case where the original negligence of the defendants is not established. It would seem to me that once the original negligence was established the jury could infer from the record before us that the continuing effect of that negligence was the proximate cause of the ultimate fall. In any event, it would seem that the defendants should have the burden of going forth with the evidence and showing, if they can, that the effect of the drug originally administered had worn off to the extent that it was not the proximate cause

of the fall. Under all circumstances involved here it appears to me that there is a question of proximate cause that lies within the realm of the jury's determination.