**Mrs. O. F. WARNER and O. F. Warner, Appellants,**

v.

**KIOWA COUNTY HOSPITAL AUTHORITY, a Public Trust, et al., Appellees.**

**No. 47695.**

Court of Appeals of Oklahoma, Division No. 2.

Feb. 17, 1976.

Rehearing Denied April 5, 1976.

Released for Publication by Order of Court of Appeals July 1, 1976.

Philip R. Douglas, Smith, Smith & Vaughan, Oklahoma City, for appellants.

George F. Short, Pierce, Couch, Hendrickson & Short, Oklahoma City, for appellees.

BRIGHTMIRE, Judge.

She was a frail, 90-pound wisp of a woman when admitted to Kiowa County Hospital on Thursday, January 15, 1970, with an infected third-degree burn on her left elbow. A few days later, while under the influence of potent tranquilizing and analgesic drugs administered to combat pain and a condition of "alcoholic psychosis," the 61-year-old patient climbed over erected bedrails and fell causing multiple fractures of her right femur and hip joint —an injury requiring two later surgical operations and resulting in a shortened, right leg.

This lawsuit—brought by Mr. and Mrs. Warner against the hospital and others to recover damages for the leg injury—resulted in a jury verdict for defendants. From an order denying their request for a new trial, plaintiffs appeal claiming the trial court committed two reversible instructional errors, namely: (1) a misstatement of the hospital's legal duty owing Mrs. Warner (whom we shall refer to as plaintiff from here on) and (2) the giving of an instruction on contributory negligence which told the jury plaintiff could not recover if she did or failed to do anything falling below "that degree of care and caution which *an ordinarily prudent person* would have exercised under the same or similar circumstances." (emphasis added)[1]

I

Shortly after Josephine Warner got to the hospital the examining physician, Dr.

---

1. Appellants' brief in this case is disappointing and suggests it might be the work product of an unsupervised legal intern. The brief's author should read Rules 13, 14, 15, and 20 of the Rules of the Supreme Court of Oklahoma, 12 O.S.1971, Ch. 15 App. 1 before writing another one. He violated every one of them.

Bridwell, found her in a state of emaciation with a poor nutritional status, a "palpable and tender" liver and, of course, a painful third-degree burn on her left elbow accompanied by an elevated temperature.

Definitive treatment of the burn was ordered which included whirlpool therapy, Sulfamylon cream to the wound, administrations of a special vitamin preparation, high-protein diet, Vistaril (a tranquilizer) and Talwin (an analgesic). As a final admission order the physician also said he wanted to be informed if his patient developed the "D.T.'s" (delirium tremens).

Two days later (on January 17) Thorazine, another tranquilizer, was ordered given and on the 23rd the physician ordered hospital personnel to "Restrain [Mrs. Warner] if necessary," apparently leaving it up to the judgment of the hospital staff to determine if, when, and what kind of "restraints" would be used.

According to the nurses' notes, plaintiff's mental condition began to deteriorate after her admission, so that by 8:00 p. m. Saturday, the second post-admission day, nurse Cagle could chart that the patient was "confused and restless," although 20 minutes earlier a 50-milligram (mg) shot of Thorazine had been injected into plaintiff intramuscularly. At 9:30 p. m. nurse Cagle noted that plaintiff continued to be confused and restless and that because the first shot of Thorazine "did not seem to help," a second one was given.

The next morning, Sunday, January 18, a floor nurse wrote that plaintiff "Hears people talking about her . . . awake but cooperative." During this day she was received five doses (250 mgs) of Vistaril and two shots of Talwin. On Monday plaintiff received six doses of Vistaril (300 mgs) and two shots of Talwin.

Tuesday morning plaintiff was again described as "confused" and "out walking." On this day plaintiff received seven doses of Vistaril (350 mgs).

The first shift on Wednesday, January 21, ended on this note, "a restless 8 hrs."

The second shift remarked at 2:00 p. m. that plaintiff was "up walking in hall. Confused, hallucinating." During the 24-hour period plaintiff received another six doses of Vistaril (300 mgs) and one of Talwin, and a progress note by the attending physician described plaintiff as "disoriented."

On Thursday, January 22, the patient was given Vistaril six more times (300 mgs), in addition to two shots of Thorazine. At 2:00 p. m. the nurse charted that plaintiff was "very confused and upset—Talking incoherently" and that she refused a "2 cc" shot of Talwin. The day ended with this midnight entry pertaining to the patient, "Up about halls—very restless et [and] talking loudly. App. [appears] very confused."

Friday, January 23, began with a call to Dr. Bridwell who verbally ordered an extra dose of Thorazine given and authorized use of restraints. Restraints were applied. Plaintiff got 200 mgs of Vistaril, 150 mgs of Sparine (another potent tranquilizer) and 1 cubic centimeter (cc) of Talwin during the day. Dr. Bridwell summarized her condition in a progress note saying plaintiff "Is wild as a March hare, and she—we had to restrain her last night, we will increase her medicines quite markedly and put—talk about getting a court committal to Western State Hospital [a state institution for the mentally ill]." Shortly before midnight the nurse found her "Out of bed" and after midnight noted Mrs. Warner was "Awake—still restless but not noisy."

Saturday, January 24, the day of the fall, began with plaintiff "still restless" despite the administration of substantial quantities of drugs. Between four and five in the morning the nurse noticed plaintiff "talking to self." An hour later the same nurse gave the patient 50 mgs of Vistaril even though Dr. Bridwell had ordered it discontinued the day before. The nurse's notes continue rather routinely until after the last entry of the 7:00 to 3:00 p. m. shift. Following a 2:30 p. m.-shift

summary indicating plaintiff had "a quiet day," are four blank lines at the bottom of the page—an unusual finding. The next entry is on the next page headed "3–11 p. m." All entries on this page are in the handwriting of nurse Cagle. The first one is 4:00 p. m., recording that "Med." was given, namely, 50 mgs of Sparine and a vitamin. Next, 5:00 p. m. was written on the record as the time a high-protein meal was given Mrs. Warner. Then came this long statement following a time entry of 5:20 p. m. "When Mrs. Lyons—aide—was picking up the tray in this pt's. [Mrs. Warner] room she found that pt. [patient] out of bed. She (pt.) took a step backward and sat down on floor. Side rails were up on both sides of the bed at the time. With help Mrs. Lyons picked up the pt. and put her in bed. Dr. Bridwell was called. Pt. was taken to X-ray . . . ." Nurse Cagle added this 10:45 p. m. note, "a fair 8 hrs."!

To place plaintiff's mental condition in perspective it must be borne in mind that during the 48 hours before her fall defendants admitted plaintiff was given at least 300 mgs of Vistaril, 75 mgs of Thorazine, 300 mgs of Sparine, and 2 ccs of Talwin —all potent drugs designed to affect the central nervous system. During the 25 hours preceding the fall plaintiff got at least 150 mgs of Vistaril, 250 mgs of Sparine, and 1 cc of Talwin. And during the 13 hours which elapsed before the fall plaintiff received 150 mgs of Sparine—a quantity regarding which Dr. Bridwell said in a February 2 progress note: "She is very sedated this morning, got 150 mgs of Sparine through the night which is too dam [sic] much for her, which was more than she could handle and she is metabolizing it now."

Supplementing the foregoing charted evidence was the trial testimony of Dr. Bridwell, aide Lyons, plaintiff's husband, and one of two sisters. Mr. Warner said he visited his wife about 7:00 a. m. on January 24 and she did not recognize him and would not respond to questions except by

unintelligible mumbling. Mr. Warner, a railroader, left, ate breakfast, and returned to the hospital. His wife's condition had not changed. He noticed the bedrails were up and a gauze restraint was tied around her right wrist and the bedrail.

In a similar vein Mrs. Warner's sister told of being in the room between about 2:00 and 5:00 p. m. on January 24. She, too, found that her sister did not respond to verbal stimuli and acted as though she did not know her. The visitor noticed during this time that the bedrails were up and gauze restraints were tied around the patient's wrists and the rail.

Testifying on a broader plane, Dr. Bridwell said the three different tranquilizers given plaintiff—Vistaril, Sparine and Thorazine—were "to calm her down" and relieve her restlessness, which he thought was probably due to withdrawal from excessive use of alcohol. The effect of these drugs, explained the physician, depends upon a person's size. A small person, such as plaintiff for example, would have a lower tolerance than a larger one. There is also the element of "potentiation," i. e., the increased strength and prolonged effect of a dose which accumulates from a series of doses, both of the same drug and of others having a potentiation capability. Thus, while the first 50-mg dose of Sparine may have a moderate effect for about six hours, prior Vistaril administration, as well as further Sparine doses, tend to build up in the body and create a more potent, cumulative effect lasting 12 hours. One of the potential side effects of these drugs is a disturbance of one's equilibrium and sense of balance.

The means of restraining a patient vary with the conditions. Bedrails will usually be sufficient to keep a patient from rolling or falling out of bed. They, however, will not prevent a mentally disturbed patient from climbing out of bed. Such a patient must either have a sheet tied across his body, a "posey belt," or some form of arm or hand fettering.

Whether a disoriented, confused, hallucinating patient will have trouble feeding himself depends upon the severity of the disturbance. Often he can feed himself because, says the doctor, it is "something we do habitually." But getting out of bed is another matter. A confused patient should never be allowed out of bed without an attendant with him for obvious reasons.

During the afternoon of January 24 plaintiff's mental condition was so abnormal that the hospital found it necessary to restrain her by tying her wrists to the bedrails with gauze. The chart is silent as to who brought Mrs. Warner's dinner to her around 5:00 p. m. The notes show only that she was given a dose of Sparine for restlessness at 4:00 p. m. No mention is made of plaintiff's condition at 5:00 p. m. Presumably, whichever aide brought the tray of food removed the gauze wrist restraints and placed them on a nearby table without the knowledge or direction of the floor nurse or some person qualified to assess plaintiff's mental condition. The only hospital employee testifying before the jury was nurse's aide Lyons, who was put on the stand by plaintiffs as an adverse witness.[2] According to aide Lyons, no one was in Mrs. Warner's room when she climbed out of bed. Lyons had not delivered the tray of food earlier and therefore it was not she who had removed the wrist restraints. She had neither seen nor talked to plaintiff before entering her room shortly after 5:00 p. m. to pick up her food tray. When she first entered the room, Lyons said, the tray was on the portable bedside table which goes through the rails and extends across the bed and Mrs. Warner was still eating. The rails were up and the bed was as low to the floor as it could go. Lyons saw the wrist restraints lying on the bedside table. The aide said she "asked her who the ladies were that had been visiting her," and that Mrs. Warner told her they were her sisters, adding that "she was going to call her

husband the next morning"—a rather significant remark in terms of plaintiff's mental condition in view of the fact her husband had visited with her no less than three times that day.

When plaintiff finished eating, continued the aide, she was asked if Lyons could do anything else for her. Plaintiff, she said, asked her to roll the head of the bed down so that she could take a nap. Lyons took the tray, removed the portable table, and left the room without replacing the wrist restraints. About the time she got to the tray cart down the hall 30 or 40 seconds later, she heard a noise like the rattling of bedrails coming from Mrs. Warner's room. The aide "dashed" back into the room and found that plaintiff "had got out of bed at the end of it facing me. She stepped back and sit [sic] down."

Aide Lyons admitted she knew Mrs. Warner had the D.T.'s off and on, but denied knowing about the drugs plaintiff had been given. She had not checked plaintiff's chart before going to her room, nor was she advised or instructed by the floor nurse regarding plaintiff's medication or mental condition. There was no reason to, she said, presumably because the responsibility for Mrs. Warner's safety was not hers.

When aide Lyons went in to get the tray she said at one point Mrs. Warner appeared to be "alert" and then a short time later said, "she acted like a relaxed person to me wanting to take a nap." Defendants made no effort to establish why nurse's aide Lyons did not replace plaintiff's wrist restraints, leaving it up in the air as to whether the aide made the decision to leave them off or forgot to put them back on. If a decision she made then proof of such fact, as well as of her competence to do so, is conspicuous by its absence. In this regard it is significant that seconds after the aide assessed Mrs. Warner's condition as both "alert" and "relaxed" the pa-

---

2. Defendants did not call nurse Cagle who wrote the self-serving accident note, nor was anyone called to describe Mrs. Warner's mental condition before she ate.

tient climbed over the end of the bed and fell—behavior which in itself demonstrates continuation of irrationality and disorientation. Nor did the fall improve plaintiff's mental picture because at 10:15 p. m. she was given a double dose (100 mgs) of Sparine intramuscularly, 50 mgs at 2:00 a. m., 50 mgs at 4:00 a. m. and 100 mgs at 6:10 a. m. and by 4:00 p. m. the next day a nurse could chart that Mrs. Warner was "still restless—picking at the air—talking."

Finally Mrs. Warner took the stand and testified she remembered nothing about what happened on January 24, the day her hip was broken in the Kiowa County Hospital.

## II

In their petition plaintiffs attributed the fall to the hospital's negligent failure to adequately restrain or otherwise prevent Mrs. Warner from harming herself—particularly from getting or falling out of bed —under the circumstances of her known drugged and agitated mental condition.

The hospital answered by denying everything and alleging that all of its employees "exercised that degree of care and skill that any reasonable and prudent employee, administrator, superintendent, nurse, or other personnel could and would have exercised under the same or similar circumstances." Then the hospital blamed the fall on its patient, saying that she "herself was negligent and that her negligent acts proximately caused or contributed to the happening of the alleged accident,"

without stating any facts to support the conclusion.

## III

At a trial held in April 1974 the jury heard only such evidence as came forth during the production of plaintiff's case in chief, the essence of which we have already narrated. In advising the jurors what factual issues they were to decide, the court read the pleadings and said, "the statements and allegations contained in the pleadings . . . simply define the issues to be tried . . ." Then it told the jurors that plaintiffs had to prove "all of the material allegations of their petition" and if they hadn't the "verdict should be for the defendants." [3]

In the next instruction (No. 5) the trial judge said, "the burden of proof is upon the defendants to establish the affirmative defense of contributory negligence upon the part of . . . Mrs. O. F. Warner," although they could consider all the evidence admitted.

A series of definitional instructions followed. "Actionable negligence" was described as consisting of three elements: (1) the existence of a duty owing from defendant to plaintiff, (2) defendant's breach of that duty, and (3) injury to plaintiff caused by the breach. The word "negligence" was defined differently in another instruction as a term which "imports a want of such attention to the nature or probable consequence of an act or omission

---

3. Of course this is not correct. Plaintiffs did not have to prove "all of the material allegations of their petition" in order to recover. For instance, plaintiffs alleged that defendant hospital was "careless and negligent in acting by and through their agents, servants and employees . . . [and] that said employees, administrators, superintendents, nurses, and other personnel, and through said personnel, the defendants herein, were on actual notice that plaintiff [Mrs. Warner] was mentally confused, agitated and hallucinating . . . [and] unless [she] was prop-

erly supervised, or restrained, or kept under constant watch that she could, and likely would, sustain injury due to her confusion, agitation and hallucination."

In point of fact plaintiffs proved only that a condition of confusion, disorientation and hallucination existed in Mrs. Warner during the prefall hours. The allegation of "agitation" was a material one, but it was not an essential allegation in terms of plaintiffs' right to recover in view of other proof that Mrs. Warner was mentally incapable of caring for herself.

as a prudent man ordinarily bestows in acting in his own concerns." [4]

In Instructions Nos. 11 and 12 the court defined "contributory negligence" as meaning "any act or omission on the part of the plaintiff, Mrs. O. F. Warner, which amounts to a want of ordinary care on her part, which, combining and concurring with the negligent acts of the defendants, is the proximate cause of the injury complained of." The jury was told contributory negligence bars plaintiffs' right to recover.

"Proximate cause" of an injury was defined as an act resulting in an injury which "could have been reasonably foreseen by a prudent person in the exercise of due care although it might not have been specifically contemplated or anticipated."

Tossed in also was a clutter instruction, needlessly explaining as a defense-oriented redundancy—"the fact that an accident happened and the plaintiffs were damaged as a result thereof gives rise to no presumption of negligence or liability on the part of the defendants . . . . " Why the court gave this defense argument disguised as an instruction is not readily apparent because we have searched the record and cannot find where either party ever suggested that if plaintiff proved an accident happened and she was injured defendant was presumed to have negligently caused it. The case had been pleaded, tried and submitted on the very opposite presumption. Actually, while the issue had not been raised, a contrary instruction may indeed have been more appropriate—that is, one applying the doctrine of res ipsa loquitur to the foundation facts presented here. See *St. John's Hosp. & School of Nursing, Inc. v. Chapman,* Okl., 434 P.2d 160 (1967).

Passing on, however, to Instruction No. 15 the court told the jury that "there is an implied obligation or duty on the part of hospitals to exercise ordinary care and attention for their patients, and that care and attention should be in proportion to the physical and mental illness and condition of the particular patient. The degree of care and diligence required is measured by both the mental incapacity of the patient and the dangers which the surroundings indicate may befall such patient in view of any peculiar mental traits exhibited by the patient. *This is always limited by the unbending rule that no one is required to guard against or take measures to avert that which, under the circumstances, is not likely to happen, or, more accurately, which a reasonably prudent person under the circumstances would not anticipate as likely to happen. No person does or is required to take measures to avert dangers which the circumstances as known to him do not suggest as reasonably likely to happen.* These circumstances include the patient's mental condition and aberrations and what she is likely to do by reason thereof.

 "You are instructed," continued the court, "that if the . . . employees of the defendants had notice that the plaintiff, Mrs. O. F. Warner, was suffering from confusion, agitation and a hallucination, *and that there was probable and reasonable cause to believe that by reason of such conditions she would commit some act by which she would be injured, it was the duty of the . . . employees . . . to use ordinary care and attention in order to prevent the patient's injury."* (emphasis added) The first two sentences of this instruction bear a resemblance to established law in this state—the rest of the instruction does not. We find no case holding it

---

4. Actually the court was attempting to define a person's common law "duty" as distinguished from the broader term "negligence." This duty definition, as we shall see, would seem to be somewhat irrelevant to the particular facts involved here and actually tends to contradict a later instruction (No. 15) defining more specifically the hospital's legal duty to plaintiff. Obviously a hospital owes a specialized duty to its patients—one arising from special knowledge—not just the duty a medically untrained and uninformed "prudent man" owes others.

to be a rule, "unbending" or otherwise, that hospitals have no duty to guard against foreseeable consequences unless they are "likely to happen" or which "probably will" occur. Nor can we find authority for the trial court's final assertion that the hospital had no duty "to use ordinary care and attention in order to prevent the patient's injury" unless it "had notice . . . Mrs. O. F. Warner was suffering from confusion, agitation and a hallucination, and that there was probable and reasonable cause to believe" she would commit some injurious act as a result of such condition. How the trial judge happened on to this is not clear, but part of it is set out in the hospital's second requested instruction which is shown as having been refused. The "unbending rule" language may represent an unwitting straying from the subject of duty and into the adjoining, shadowy domain of proximate cause. If so a misstatement still occurred because under the circumstances of this case—involving a hospital-patient relationship—the foreseeable requirements of legal causation do not so reward myopia.[5] Instruction No. 16 deals with the hospital's liability for the negligent acts of its servants, and No. 17 appears to be a longer version of No. 16, both of which direct that plaintiffs cannot recover if Mrs. Warner was "guilty of contributory negligence." Instructions Nos. 18, 19, 20, 22, and 23 speak to the subject of the damages recoverable by plaintiffs and it is remarkable that in each and every one is monotonously chanted the same finding and directory refrain replete with a reminder that plaintiff must not be "guilty of contributory negligence."

IV

Plaintiffs' first proposition is that the trial court reversibly erred in refusing to give their first requested instruction which reads:

"You are further instructed that a hospital, in the care of its patients, must exercise such care and caution for their safety as the patient's mental and physical condition, as known or should be known to the hospital authorities, may require."

We agree this requested instruction should have been given; and along with giving it, the trial court should have abstained from giving elaborating Instructions Nos. 8 and 15 which incorrectly narrowed the hospital's duty to its patient.

The scope of a hospital's duty to its patients in this state is not now in doubt and has not been for more than half a century. In *Tulsa Hosp. Ass'n v. Juby*, 73 Okl. 243, 175 P. 519, 22 A.L.R. 333 (1918) the hospital appealed from a jury verdict in favor of its former patient, Mrs. Juby, contending that a submissible case of negligence had not been made out by plaintiff when she proved that following her appendix and gall bladder operation, rainwater leaked through the hospital roof onto her bed; and because the hospital personnel failed to remove her from the wet bed for about two hours, she contracted pneumonia. In rejecting the hospital's conclusion the court quoted with approval from opinions of three sister states, each elaborating on the duty of a hospital. " 'It [a hospital] is bound,' " reads the first one in part, " ' to exercise that degree of care toward its patients, measured by the capacity of such patients to look after and provide for their own safety. It is the duty of such hospital to employ only competent physicians and nurses, and to treat such patients with such skill and care as ordinarily obtains in the conduct of such institutions, and to protect its patients in such manner as their condition may render necessary,

---

5. For example, one who breaches his legal duty is liable for consequences which a prudent person acquainted with the facts would have thought at the time of the negligent act as *"reasonably possible"* to follow if they had been suggested to his mind, even though the specific ultimate consequence may not have been contemplated or anticipated. *Sturm v. Green*, Okl., 398 P.2d 799 (1965).

and such degree of care and diligence should be in proportion to the physical or mental ailments of the patient rendering him unable to look after his own safety.' "

From another is this language: " 'The extent and character of this duty depends on the circumstances of each particular case.' "

And in the third quote there is a statement of the duty which has been approvingly paraphrased by the high tribunal since.[6] " 'A patient is generally admitted to a hospital . . . under an implied obligation that he shall receive such reasonable care and attention for his safety as his mental and physical condition, if known, require. . . . Any other rule would be a reproach to the law and to hospital management. . . . A nurse's absence for five minutes may amount to negligence. . . .' "

■■■ Hospitals, of course, by definition are establishments created primarily as havens for the sick and afflicted. In this state one cannot operate a hospital without obtaining a license from the State Commissioner of Health and complying with rules, regulations, and standards promulgated by the State Board of Health—regulations designed to require at least minimum professional proficiency in terms of patient care and protection. 63 O.S.1971 §§ 1–702, 1–705, 1–707. It is apparent that the duty devolving upon a hospital in performing its mission is something more than that which the law imposes on a prudent individual daily conduct of everyday affairs. The latter must comply with the abstract standard of care a reasonable and prudent person should exercise under a given set of circumstances—a standard not applicable to pursuits requiring special knowledge because, for example, the care a prudent plumber might use in handling an injured colleague might be reasonable for a plumber but grossly unreasonable for a licensed physician or registered nurse. Thus the

rule is that "ordinary care" is that degree of care which ordinarily prudent and competent persons engaged in the same line of business or endeavor should exercise under similar circumstances. *Atchison, T. & S. F. Ry. v. Kennard*, 199 Okl. 1, 181 P.2d 234 (1946); *Oklahoma Gas & Elec. Co. v. Wilson*, 172 Okl. 540, 45 P.2d 750 (1935). The term "ordinary care" in law means the same as "due care" and "reasonable care." *Denco Bus Co. v. Keller*, 202 Okl. 263, 212 P.2d 469 (1949). And reasonable care " 'demands increased watchfulness and greater caution' " in the presence of increased dangers and of circumstances pregnant with the potential for harm. *Texas Cc. v. Robb*, 88 Okl. 150, 212 P. 318 (1923); *Tulsa Hosp. Ass'n v. Juby*, supra.

V

Plaintiffs' second proposition—that the recorded evidence will not support a finding that Mrs. Warner was contributorily negligent—is likewise well taken. The hospital, as we said earlier, alleged conclusionally that the fall was either all plaintiff's fault or partly so. It gave no factual specifics regarding the defense and offered no evidence of its own in support thereof. It relies solely on an expression by a nurse's aide elicited during the production of plaintiffs' case that shortly before the fall Mrs. Warner appeared to her to be both "alert" and "relaxed." By offering this testimony as "evidence" of contributory negligence, the hospital is impliedly acknowledging the broad scope of its obligation to protect its patients from harm and that such duty expands as the patient's capacity for self-protection shrinks. It also is recognizing, again by implication, at least, that the propriety of instructing on contributory negligence depended on proof that its patient's mental capacity was unimpaired at the time of the fall, and that she was mentally and physically fit to provide herself with such protective care as a normal person would bestow on himself. In-

6. *Hillcresi Medical Center v. Wier*, Okl., 373 P.2d 45 (1962); *Flower Hosp. v. Hart*, 178 Okl. 447, 62 P.2d 1248 (1936).

deed in its short "statement of facts" the hospital conceded Mrs. Warner lacked mental competence to protect herself from harm at least, part of the time by saying that her "symptoms of alcohol withdrawal were intermittent, i. e., she went through periods of time during which she was clear and alert and, also, periods during which she was somewhat disoriented."

■ It is doubtful if the evidence justi-. fies the conclusion that Mrs. Warner was ever "clear" during the prefall period, and though at one point she may have appeared to an aide to be "alert," the remark really does not achieve the importance which the hospital attaches to it in view of the conclusions placed in the record by medical experts diagnosing Mrs. Warner mentally as psychotic with an overlay of neuroleptoanalgesic drugs at the time of the fall. It appears that aide Lyons used the term "alert" in the sense that Mrs. Warner was awake and conscious. If so, the revelation was not a circumstance tending to prove or disprove the status of Mrs. Warner's mental competence. Certainly no expert testimony was offered on the subject.[7] Dr. Bridwell stated rather poignantly that the usual way of determining if a patient is oriented as to time, space, and place is to ask him who he is, where he is, what day or time of day it is. The patient may be confused about one or all of them and if so he is said to be disoriented. Furthermore the physician pointed out a "disoriented, confused, hallucinating patient" may or may not have trouble feeding himself because self-feeding is such a habitual thing. Defendant hospital does not suggest aide Lyons attempted to determine whether or not Mrs. Warner was oriented. The probable reason for this is its awareness

that she was not trained to make such a diagnosis and did not attempt to do so. It seems reasonable to conclude that if the hospital could not rely on the aide's observations as valid assessments of a patient's mental status then neither should a jury. Hence they were insufficient to supply a basis for finding Mrs. Warner was possessed of a sound mind capable of appreciating the dangers associated with climbing out of bed.

Moreover, even had the evidence been sufficient, the substance of the instructions was not for two reasons: (1) the jury was not required to resolve the mental capacity issue as a preliminary matter—a fundamental error; and (2) the contributory negligence instruction given required of Mrs. Warner too high a standard in view of her admitted psychotic and drugged condition.

First let us look at what the trial court instructed the jury it could find in regard to the defense. In Instruction No. 11 the jury was told that contributory negligence "means any act or omission on the part of the plaintiff, Mrs. O. F. Warner, which amounts to a want of ordinary care on her part, which, combining . . . with the negligent acts of the defendants, is the proximate cause of the injury complained of." Earlier "ordinary care" had been defined as "that degree of care and caution which an ordinarily prudent person would have exercised under the same or similar circumstances."

Now it at once becomes obvious that for Mrs. Warner to have exercised such a degree of care and caution on January 24, 1970 she necessarily would have had to possess the same normal mental faculties an ordinarily prudent person is presumed

---

7. As we pointed out earlier the hospital had already concluded that Mrs. Warner needed not only erected bedrails, but wrist restraints during the afternoon of January 24. There is no evidence that a different determination was made by physician's order or by competent hospital personnel. If aide Lyons did not intend to replace the wrist restraints, then the question arises as to why not? Was

this her decision or someone else's? Did she forget to replace them? Or did she intend to replace them after depositing the tray on the cart? Whatever the situation was, the fact remains that the hospital had earlier decided Mrs. Warner needed wrist restraints, and the observations of aide Lyons by themselves could not render that decision inoperative.

to possess. And if she did not, then, of course, the standard of care imposed upon her by the instructions was oppressive. It hardly seems reasonable for the law to exact from Mrs. Warner the exercise of more care than she was capable of exercising under the circumstances. For if it did, the result would be that the hospital's duty to protect a mentally disturbed person from harm would evaporate the moment the patient got injured doing something a prudent person using care and caution would not do—for example, climbing over the bedrails or end of a bed without help. Thus, as one court put it, "the [hospital] could become indifferent to the performance of [its] duty knowing that the very eventuality that [it] was under a duty to prevent would, upon its occurrence, relieve [it] from responsibility." *Hunt v. King County*, 4 Wash.App. 14, 481 P.2d 593 (1971).

 Because of the somewhat unique circumstances attendant to a hospital-patient relationship, it is not surprising to find courts declining to allow the imputation of contributory negligence to institutionalized, mentally impaired patients. *Gould v. State*, Ct.Cl., 181 Misc. 884, 46 N.Y.S.2d 313 (1944). Even absent hospitalization the general rule is that one who is so insane or devoid of intelligence as to be totally unable to apprehend danger and avoid exposure to it is not a responsible human agency and cannot be guilty of contributory negligence. *Noel v. McCaig*, 174 Kan. 677, 258 P.2d 234 (1953); *Lawrence v. Bamberger R. R.*, 3 Utah 2d 247, 282 P. 2d 335 (1955). Although the question with regard to insanity has not been passed upon in this state a kindred one—dealing with children—has been decided establishing that a child of tender years lacks capacity to be contributorily negligent. *Ramage Mining Co. v. Thomas*, 172 Okl. 24, 44 P.2d 19 (1935). Underlying the holding is the realization that the mentality of a very young child has not developed to the point where he can comprehend and appreciate dangers inherent in various situations. In principle we see no reason why

an adult who is so mentally ill or drugged that he can not comprehend or appreciate dangers inherent in his acts should not be accorded the same legal protection.

 We agree with and adopt as our holding the conclusion reached by the court in *Hunt v. King County*, supra—that "it is prerequisite to a defense of contributory negligence in a hospital-patient case that the patient be capable of exercising the care of a reasonable man, *i. e.*, able to appreciate the risk of harm and able to act reasonably on the basis thereof." And as to such prerequisite, the burden of proof lies with he who offers the defense.

Defendant hospital more or less acknowledges familiarity with these principles but attempts to avoid their applicability here by arguing "a different standard" of care can apply only where plaintiff is a child or is insane, citing a case involving a 12-year-old boy and the Restatement (Second) of Torts § 464(1) (1965), which reads: (1) Unless the actor is a child or an insane person, the standard of conduct to which he must conform for his own protection is that of a reasonable man under like circumstances." But, says defendant, on January 24, 1970 Mrs. Warner was "neither a child nor insane." In furtherance of its argument the hospital mistakenly refers to aide Lyons as a nurse and contends that she is "the only witness to the alleged accident" (actually Lyons was out in the hall and did not see Mrs. Warner climb out of bed) and she "testified that Mrs. Warner was relaxed and alert . . . and that she was out of the room only thirty to forty seconds before returning to see Mrs. Warner 'sit down on her hunkers' . . . . This testimony standing alone," concludes the hospital, "is enough for the jury to reasonably infer a *possibility* of contributory negligence on the part of the appellant." (emphasis added)

Aside from the lack of probative value, the speculative term "possibility" implies that the argument, of course, is premised on the assumption that the aide's prefall

observations were inconsistent with the patient's insanity, not only at the time they were made, but at the time of the fall—a slight time differential that cannot be entirely ignored in light of defendant's "in and out" view of Mrs. Warner's mental lucidity. But are they?

■ The word "insane" is generic in nature and " 'ordinarily implies every degree of unsoundness of the mind or of mental derangement, from temporary nervous excitement to acute insanity . . . .' " said the court in *Oklahoma Natural Gas Corp. v. Lay*, 175 Okl. 75, 51 P.2d 580 (1935). Furthermore, the court continued, the phrase " ' "Unsoundness of mind" has been judicially declared to be synonymous with "insanity" . . . [and] exists where there is an essential privation of the reasoning faculties, or where a person is incapable of understanding and acting with discretion in the ordinary affairs of life.' "

There is, as we mentioned earlier, no testimony from a qualified expert establishing that Mrs. Warner could not have been disoriented or otherwise possessed of an unsound mind and still have appeared to aide Lyons as "alert" and "relaxed"—conclusional words, incidentally, educed by hospital which was improperly allowed to "cross-examine" its own employee, called as a hostile witness by plaintiff—on a crucial subject by asking leading and suggestive questions. Even so, when the witness was asked "[d]id she [Mrs. Warner] appear to you to be oriented and rational and alert?" (while finishing her dinner), the aide chose only the last word in answering, "Alert, very alert at that time."

"Did she appear to you in any way to be confused or extremely nervous or exhibiting any anxiety or evidence that she was irrational or apt to get out of bed?" led on the defense counsel.

"No, she acted like a relaxed person to me wanting to take a nap."

The latter answer suggests not an alert person but a drowsy one under the influence of drugs. And this negates the idea that the testimony of aide Lyons was sufficient in itself to raise even a "possibility" that Mrs. Warner could have negligently contributed to her injuries. It seems appropriate at this point to mention that at least one court has taken judicial notice that tranquilizers may cause disorientation in passing on a case filed by an injured woman who fell after being tranquilized. *Schulz v. Feigal*, 273 Minn. 470, 142 N.W. 2d 84 (1966).

Furthermore, it has to be a rejection of reality to suggest a reasonable person would, in the face of an abundance of direct, circumstantial and expert opinion evidence identifying Mrs. Warner's mental condition as psychotic and irrational both before and after the fall, find that she was possessed of normal mental faculties just at the time she climbed out of bed and based solely on the statement of an aide that a few moments before, Mrs. Warner appeared to be "alert" and "relaxed"—an aide, incidentally, whose duty it presumably was to restore the wrist restraints upon removing the portable table from across the bed. Assuming a reasonable person could so find, it requires a faith that moveth mountains to believe one would.

■ The argument fails to persuade us that what aide Lyons concluded about Mrs. Warner's appearance was sufficient, by itself, to support defendant's defense of contributory negligence as the record now stands. From a procedural standpoint once plaintiff presents evidence overcoming the presumption of her mental normalcy, it becomes incumbent upon the party invoking the defense of contributory negligence to prove preliminarily that plaintiff did have the physical and mental capacity to use the care a normal person should use for his own protection. If such proof is adduced then the jury will be required to resolve the issue. If it determines plaintiff was without the mental capacity to fully appreciate the nature and consequences of her acts and to protect herself, then that ends it. But if the jury finds otherwise, then it

must go on and decide whether plaintiff, under all the circumstances, failed to use such care for her own protection as would have been used by a person in her same physical and mental condition. *Boyett v. Airline Lumber Co.,* Okl., 277 P.2d 676 (1954).

■■ Finally, defendant mentions that Okla.Const. art. 23, § 6 requires that the defense of contributory negligence be considered a question of fact and left to a jury. This provision does not, however, relieve defendant of an obligation to prove the defense. Submission of the defense to a jury is not required where the evidence will not support a finding of contributory negligence on the part of plaintiff. *Fuller v. Neundorf,* Okl., 278 P.2d 836 (1954); *Yellow Taxicab & Baggage Co. v. Cooke,* 171 Okl. 269, 42 P.2d 826 (1935).

The cause is therefore reversed and remanded for a new trial.

BACON, P. J., and NEPTUNE, J., concur.